**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
11/19/2018

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 17-35082** |
| **CARMEN MICHELLE CARTER,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 7** |
| | § | |
| | § | |
| | § | |
| **NATIONAL DIVERSITY COUNCIL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adversary No. 17-03446** |
| | § | |
| **CARMEN MICHELLE CARTER,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM OPINION REGARDING PLAINTIFF'S COMPLAINT TO**
**DETERMINE DISCHARGEABILITY**
**[Adv. Doc. No. 1]**

## I.    INTRODUCTION

National Diversity Council ("NDC"), the plaintiff in the above-referenced adversary proceeding, brought this suit under 11 U.S.C. §§ 523(a)(2) and (6)[1] to prevent discharge of a judgment it recovered against Carmen Michelle Carter (the "Debtor") as a result of a unanimous jury verdict from a state court trial.   [Adv. Doc. No. 1].

This Court held a multi-day trial in this adversary proceeding that concluded on August 8, 2018.  After closing arguments, the Court ordered NDC's counsel to file a brief addressing certain

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.  Further, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.

legal arguments by no later than September 7, 2018, and also instructed the Debtor's counsel to file a response by no later than October 8, 2018.  The Court then took the matter under advisement.

Based upon the entire record, the Court now issues these written Findings of Fact and Conclusions of Law pursuant to Rule 7052 explaining why it has decided to grant, in part, the relief requested by NDC and enter an order declaring that a portion of the judgment debt is a non-dischargeable obligation owed by the Debtor.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves the right to make additional findings and conclusions as this Court deems appropriate or as any party may request.

## II.    FINDINGS OF FACT

The relevant facts—as established by the pleadings and the evidence—are as follows:

## A.    NDC's Background

1.    NDC is a Texas nonprofit corporation with its principal place of business in Harris County, Texas.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 55:2-4; Adv. Doc. No. 1-1 at 2 of 7, ¶ 2.1].

2.    NDC seeks to promote diversity and inclusion in the workplace and in communities throughout the United States.  [*See* Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 10:5-8].  NDC hosts an annual conference that focuses on diversity and leadership workshops by securing high-profile individuals who are experts in diversity (e.g., former Secretary of State Colin Powell, former Governor Jeb Bush, and American actress Angela Bassett) to participate in the annual conference as speakers.  [*Id.* at 23:18–24:5].

3.    NDC has over 30 employees.  [*Id.* at 23:13-14].  NDC also has approximately 450 corporate members nationally.  [*Id.* at 23:15-17].

4.      Randolph Dennis Kennedy ("<u>Kennedy</u>") is the founder and chairman of NDC.[2] [*Id.* at 22:21-25].

5.      Kennedy has received several undergraduate degrees from the University of Houston, including a Bachelor of Science degree in economics, a Bachelor of Science degree in corporate science, and a Bachelor of Business Administration degree in management.  [*Id.* at 24:19-22].  Kennedy has also received a Master of Business Administration degree from the University of Houston.  [*Id.* at 24:17-20].  Prior to establishing NDC, Kennedy worked in the human resources departments of certain corporations.  [*Id.* at 24:17-19].

6.      In 2004, Kennedy first met the Debtor.  [*Id.* at 25:4-6].  Kennedy and the Debtor have been friends for ten years.  [*Id.* at 26:24–27:1].

**B.      The Debtor's Background**

7.      Since 2005, the Debtor has been a full-time professor at the University of Phoenix, where she teaches undergraduate and graduate students the following courses:  employment law; labor law; compensation and benefits; organizational development; philosophy; and business communication.  [*Id.* at 152:12-21].

8.      In 2006, the Debtor established a sole proprietorship called Diversity on Demand, which, as she described in the pretrial statement, is a "small, woman-owned business enterprise." [*Id.* at 100:24–101:2; Adv. Doc. No. 16 at 4 of 17].  In addition to Diversity on Demand, she is also the sole proprietor of Inside Diversity and Diversity on Demand for Leadership.   [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 101:14-20].  On behalf of her businesses, the Debtor offers services to coach and educate people in areas such as human resources, organizational development, and

---

[2] Aside from founding NDC, Kennedy is also the founder and chairman of Diversity & Leadership, Inc. ("<u>D & L</u>"), a for-profit business that works hand in glove with NDC and has the same mission—namely, to organize conferences for NDC's corporate members and prospective corporate members to help promote diversity in the workplace.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 19:7-14, 23:1-7].

diversity and inclusion work.  [Adv. Doc. No. 16 at 4 of 17].  Her client base has included the following types of organizations:  nonprofit organizations, faith-based organizations, small businesses, colleges, universities, government agencies, and various groups of clients in the private sector.  [*Id.*].

9.      The Debtor has a bachelor's degree in accounting from Jackson State University and a master's degree in labor relations from the University of Wisconsin – Milwaukee.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 149:9-22].  She also has an honorary doctorate.  [*Id.* at 101:9-10].

10.     The Debtor is a sophisticated businesswoman; indeed, she herself testified that she is sophisticated and experienced.  [*Id.* at 101:11-13].  She also has over 20 years of experience in human resources.  [*Id.* at 101:3-4].

11.     Because the Debtor is very knowledgeable in the diversity sector, Kennedy believed that it would be mutually beneficial if the Debtor worked as a consultant for NDC.  [*Id.* at Trial Tr. 25:7-19, 64:4-7].

**C.      The Oral Contract at Issue**

12.     At some point prior to 2012, the Debtor entered into an oral contract with NDC and D & L (hereinafter referred to collectively as "NDC") for her to provide, as a contractor consultant, certain consulting and training services to NDC's corporate members in exchange for 50% of the net profits[3] (hereinafter, this oral contract is referred to as the "Agreement").  [Pl.'s Ex. 25; Adv. Doc. No. 1-1 at 3–4 of 7, ¶¶ 4.2–4.3].  The Agreement also applied to any services rendered by the

---

[3] The Complaint in this adversary proceeding sets forth that "profits" is defined as "gross revenue minus compensation paid to individuals, other than [the Debtor], who provided the training and consulting."  [Adv. Doc. No. 1 at 3–4 of 7, ¶ 2.6].  This definition was confirmed by the testimony of NDC's chief financial officer at trial.  [Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 83:11–84:12].  From the testimony given at trial, it appears that with respect to some of the invoices that were sent, gross revenues were equal to net profits because no individual other than the Debtor provided training and consulting services.

Debtor that related to workshops, presentations, and conferences.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 19:19-23; *see* Pl.'s Ex. 25; Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 155:9-20]. The Agreement between NDC and the Debtor was that the equal profit-sharing agreement would apply even if the Debtor created the counseling or the training program or the materials.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 28:18-20].**4**

13.     In 2012, Kennedy gave the Debtor, in her capacity as a contractor consultant for NDC, the following title:  "Chief Talent & Diversity Officer."  [*See* Aug. 7, 2018 Tr. 36:18–37:1, 65:8-10].

14.     Pursuant to the Agreement, the Debtor and NDC agreed that NDC would send all invoices to NDC's members for whom the Debtor rendered consulting and training services and instruct these members to remit the payment directly to NDC.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:6-18; Adv. Doc. No. 1-1 at 3–4 of 7, ¶4.3].  The Debtor was required to send her invoice to NDC, and then NDC would send its own invoice to the member and thereafter collect the payment.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:6-18, 49:14-17; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 80:24–81:3; Adv. Doc. No. 1-1 at 3–4 of 7, ¶4.3].  Stated differently, the Debtor was **not** authorized to receive payments directly from NDC's members.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:6-18, 49:17-19; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 80:24–

---

4 As discussed in depth *infra* in this Opinion, the Court emphasizes that it is bound by the finding of the jury during the trial in the state court that the Debtor and NDC entered into an *oral* contract for the Debtor to provide certain consulting and training services to NDC's corporate members in exchange for 50% of the net profits.  [*See* Pl.'s Ex. 25].  In Texas, the statute of frauds bars oral contracts that cannot be completed within one year.  Tex. Bus. & Com. Code § 26.01(b)(6).  Employment contracts for an indefinite period of time, however, are considered performable within one year and, therefore, are not subject to the statute of frauds.  *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 184–87 (5th Cir. 1995); *Roach v. Compass Mfg., Int'l, LLC*, No. 4:13-cv-1421, 2014 WL 4185774, at *5 (S.D. Tex. Aug. 21, 2014); *Efremov v. Geosteering, LLC*, No.  01-16-00358-cv, 2017 WL 976072, at *10 (Tex. App.—Houston [1st Dist.] Mar. 14, 2017, pet. denied) (internal citations omitted).  Although this Court was not made privy to a transcript of the trial held in the state court, the fact that in the instant suit Kennedy testified that the Agreement he had with the Debtor was to continue indefinitely, [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 55:10-15], supports the finding of the jury that the Debtor and NDC entered into an enforceable oral agreement—i.e., the Agreement.

81:3; Adv. Doc. No. 1-1 at 3–4 of 7, ¶4.3]. Rather, the Debtor would receive her 50% share from NDC once NDC received payment on the invoices. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:6-18, 49:18-19; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 80:24–81:3; Adv. Doc. No. 1-1 at 3–4 of 7, ¶4.3; *see* Pl.'s Ex. 25].

15.     Peter Jason DeGroot ("DeGroot") is the Chief Financial Officer of NDC. [Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 75:14-16]. His duties included overseeing NDC's finances, managing NDC's cash flow, and administering NDC's payroll and accounts payable. [*Id.* at 76:6-15]. At the trial in this adversary proceeding, DeGroot credibly testified about the payment process when working with consultants, including the Debtor. Specifically, he testified that NDC's member would send payments to Kennedy or himself, and then upon receipt of these proceeds, he (on behalf of NDC) would then deduct the costs and expenses from this payment, remit one-half of the net profits to the consultant, and keep the remaining one-half for NDC. [*See id.* at 76:16–77:2, 80:24–81:3].

16.     Kennedy credibly testified that he, on behalf of NDC, relied on the Agreement, as it relates to performing the work, invoicing NDC's members, and receiving payments. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 37:2–38:25].

17.     By virtue of the Agreement, the Debtor and NDC agreed to cross-market their services among their respective client/companies because cross-promotion was equally beneficial to all parties involved. [*Id.* at 25:7-19, 64:4-7, 104:19-25]. Specifically, NDC's logo and Inside Diversity's logo both appear on certain contracts for which the Debtor rendered services and also on their respective websites. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 104:19-25; *see* Def.'s Ex. 35; Pl.'s Ex. 4]. Moreover, the Debtor authorized Kennedy to use her name to market and attract

prospective clients; and, similarly, Kennedy authorized the Debtor to use NDC's platform to help market her own companies.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 65:17-66:7].

18.     The Debtor did not have a non-compete agreement with NDC.  [*Id.* at 59:14-19]. The Debtor was also not required to work exclusively for NDC.  [*Id.*].

**D.     The Archer Daniels Midland Company**

19.     The Archer Daniels Midland Company ("<u>ADM</u>") became a member of NDC in 2011.  [*Id.* at 30:11-15].

20.     In August of 2012, Kennedy introduced the Debtor to representatives of ADM. [Pl.'s Ex. 1; Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 31:7-18].  The purpose of this introduction was so that the Debtor could solicit ADM's business for the benefit of NDC.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 31:19–32:2].

21.     On or around February 7, 2013, the Debtor successfully procured a small contract for $1,250.00 from ADM for coaching services (the "<u>Small Contract</u>").  [Pl.'s Ex. 4; Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 32:12-18].  The Debtor immediately notified NDC about this contract.  [Pl.'s Ex. 4].  Shortly thereafter, the Debtor performed the work and sent an invoice for her services to NDC.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 33:11–34:7].  NDC then invoiced and collected the payment from ADM, and then paid the Debtor her one-half share (i.e., $625.00) for her services.[5]  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 49:3-6; Pl.'s Ex. 10].

---

[5] At first blush, the record appears to be devoid as to whether coaching services fall within the purview that entitled the Debtor to one-half share of the net profits.  However, the evidence unequivocally shows that the above-referenced coaching services constitute training and/or consultation services, and therefore her services fell within the terms of the Agreement, which meant that NDC and she were supposed to equally split the net profits.  [Pl.'s Ex. 10, the first line referencing the payment of $625.00 to the Debtor, representing 50% of $1,250.00].  Accordingly, the Debtor and NDC each received 50% of the profits from the Small Contract for these coaching services.  [*Id.*].

**E.      The TOWR Contract Procured by the Debtor from ADM (an NDC Member)**

22.      In May of 2013, the Debtor—without NDC's knowledge—secured a scope of work from ADM for a project called "Treating Others With Respect" (the "<u>TOWR Contract</u>").  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 111:22–112:10; Pl.'s Ex. 13].  Specifically, on May 10, 2013, the Debtor sent to ADM a description of the requested services and resources associated with this project.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 111:22–112:10; Pl.'s Ex. 13].  The e-mail and attached proposal displayed the Debtor's Diversity on Demand and NDC's respective logos as well as the following designation:  "Diversity on Demand @ National Diversity Council."  [Pl.'s Ex. 13].  Additionally, the Debtor directed ADM to review the project agreement for the TOWR Contract, sign the document, and return the signed document to her attention at the following e-mail address:  Carmencarter@nationaldiversitycouncil.org.  [*Id.*].

23.      This proposal contained the following language:

> This is a Proposed Letter of Agreement effective May 10, 2013 for Ms. Carmen M. Carter on behalf of Diversity on Demand @ the National Diversity Council to conduct (6) Two-Hour Training & Education Workshops for Archer Daniels Midland (ADM) as follows:
>
> . . .
>
> **1.      PROGRAM FEES AND EXPENSES**
>
> (6) Days @ Discounted Daily Rate of $3,375
> **Total:  $20,250**
> Please Make Checks Payable to:  Diversity on Demand

[*Id.*].

24.      The language instructing ADM to make checks payable to Diversity on Demand (i.e., to the Debtor's sole proprietorship) was contrary to one of the terms of the Agreement between the Debtor and NDC.  [*See* Finding of Fact No. 14].  The Agreement required NDC's members to remit payments directly to NDC.  [*Id.*].  On May 22, 2013, ADM accepted the proposal

subject to a discounted rate and executed the project agreement.[6]  [Adv. Doc. No. 24, Aug. 7, 2018,

Trial Tr. 116:20–117:13; *see* Pl.'s Ex. 13].  The Debtor concealed the TOWR Contract from NDC

and, thus, NDC was wholly unaware of any of these undertakings.  [Adv. Doc. No. 24, Aug. 7,

2018, Trial Tr. 111:22–112:10, 115:6-11, 115:22-25].  At trial, the Debtor admitted that she never

even sent a copy of the TOWR Contract to NDC.  [*Id.* at 112:8-10, 115:6-11].

25.     The Debtor furnished the services pursuant to the TOWR Contract, sent an invoice

to ADM, and collected $13,500.00 from ADM.  [*Id.* at 117:5-15].  Although the Agreement

required a 50%/50% split between NDC and the Debtor, the Debtor testified that she did not send

NDC its one-half share of this fee.  [*Id.* at 117:16-19].

**F.     The ADM Contract Procured by the Debtor from ADM (an NDC Member)**

28.     In June 2013, the Debtor prepared and submitted to ADM a proposal memorialized

in a document entitled "Statement of Work."  [*See* Pl.'s Ex. 16].  The Statement of Work set forth

the details related to the project, including, the project information, the project objective/purpose,

the project methodology, the project scope, the project approach, the project pricing and costs, and

the payment terms and schedule.  [*See id.*].  Moreover, the Statement of Work also set forth that

the Debtor was one of two consultants who would perform the services on behalf of NDC.  [*Id.*].

The title page of the Statement of Work listed the subtitle as "Diversity & Inclusion – Consulting

& Training Project" and brandished NDC's logo directly below the name of one of the Debtor's

companies, i.e., Diversity on Demand for Leadership.  [*Id.*].  Furthermore, the "Acceptance" page

in the Statement of Work reflects "Diversity on Demand for Leadership @ National Diversity

---

[6] According to the Debtor, she and ADM agreed to a fee of $13,500.00, which was $6,750.00 less than the originally proposed fee.  The Debtor testified that ADM accepted the TOWR Contract at this lower rate.  [Aug. 7, 2018 Tr. 117:5-12].  The TOWR Contract expressly referred to NDC on the signature line where the Debtor signed, with the Debtor's capacity being denoted as "Chief Talent & Diversity Officer."  [Pl.'s Ex. 13; *see* Finding of Fact No. 13].

Council" as the company name. [*Id.*]. The Debtor signed the Statement of Work in her capacity as "Partner, Chief Talent & Diversity Officer" on behalf of "Diversity on Demand for Leadership @ National Diversity Council." [*Id.*]. After reviewing the terms of the proposal, ADM agreed to the terms and executed the agreement (the "ADM Contract"). [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 40:8-14, 118:5-8; Pl.'s Ex. 18].

29.     Pursuant to the terms of the ADM Contract, ADM agreed to pay $147,350.00 for the services outlined in the Statement of Work. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 119:13-16; Pl.'s Ex. 16]. This was the largest scope of work that NDC had ever received from one of its members. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 36:15-17]. Unlike the TOWR Contract, the ADM Contract did not contain specific language as to whom to make the checks payable. [*See* Pl.'s Ex. 16]. Nevertheless, the Court finds that the Debtor directly invoiced ADM and did not instruct ADM to send the payments to NDC, as required under the terms of the Agreement. [*See* Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 123:1-3].

30.     After the ADM Contract was signed, the Debtor began providing consulting and training services in accordance with the terms of the Statement of Work. [*Id.* at 43:15–44:2, 118:21-23]. At this time, NDC was unaware that the Debtor had started performing services for ADM. [*Id.* at 44:1-2].

31.     Furthermore, unbeknownst to Kennedy or any other representative of NDC, the Debtor directly invoiced ADM and continued to instruct ADM to remit payments to her instead of NDC; ADM complied as instructed. [*Id.* at 44:6-12, 120:9-11, 123:1-3]. Shortly thereafter, on July 22, 2013, the Debtor notified Kennedy that ADM had approved the Statement of Work and sent a copy of the ADM Contract to Kennedy. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 37:25–38:3, 40:15-17; Pl.'s Ex. 18]. Subsequently, the Debtor stopped communicating any additional

details to Kennedy, which created an impression that she was still negotiating minor terms of the ADM Contract with ADM's representatives when, in fact, she had already performed services, sent invoices to ADM, and received payments from ADM.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 42:6-15, 43:23–44:12; *see* Pl.'s Ex. 18].

32.      On July 23, 2013, Kennedy requested DeGroot to contact the Debtor to determine the status of the project.  [Pl.'s Ex. 18; Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 40:8–41:10].

33.      Pursuant to Kennedy's request, DeGroot e-mailed the Debtor and stated: "Dennis [Kennedy] mentioned that you sent ADM an invoice already for the deal.  Can you send that to me?  Since this will be under Diversity & Leadership, we need to make sure the correct entity was reflected on the invoice and Mai Anh will need to create the invoice internally within QB to track it.  I appreciate your help."[7]  [Pl.'s Ex. 18].    The Debtor thereafter did not send any invoices to DeGroot or any other representative of NDC.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 42:6-15, 43:23–44:12; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 93:10-12].

34.      Kennedy continued to ask the Debtor for invoices.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 44:6-12].  The Debtor assured Kennedy that she would provide them once she began providing services to ADM—even though she had already started doing so and had begun invoicing ADM.  [*Id.* at 43:23–44:2, 44:6-15].  Kennedy relied upon the Debtor's assurances that she was going to send the invoices to him.  [*Id.* at 44:13-15].

35.      On September 9, 2013, at 9:11 A.M., because the Debtor still had not sent any invoices to him, Kennedy e-mailed the Debtor and requested an itemized spreadsheet detailing the work she had completed thus far, plus the total amount that she had billed to ADM.  [Pl.'s Ex. 19]  Indeed, he expressly asked her how much she had invoiced and how much she had received.  [*Id.*].

_____
[7] Mai Anh is an employee of NDC.

On the same date, at 2:02 P.M., the Debtor replied that "Per the Statement of Work of which NDC is in receipt since July --- 25% received to date – less 1% discount or $36K – as discussed, that project kicked off today --- as I am at ADM as I type."  [*Id.*].  Stated differently, the Debtor represented to Kennedy that she only started rendering services to ADM on September 9, 2013. This statement was untrue because the Debtor had already begun providing services and receiving payments for the work that she had performed pursuant to the ADM Contract.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 43:15–44:12].  Indeed, Kennedy discovered that the Debtor had already started performing the services outlined in the ADM Contract when he received a call on September 9, 2013, from an ADM representative, who told him that the Debtor had already been working on site.  [*Id.* at 43:15–44:12].

36.     On September 9, 2013, at 3:30 P.M., Kennedy replied to the Debtor's e-mail and scheduled a call with her for the following Monday.  [Pl.'s Ex. 19].  On September 16, 2013, Kennedy called the Debtor to gather details regarding her conduct with ADM—including the work performed and any invoices sent.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 45:3–46:14].  During the call, the Debtor assured Kennedy that she would provide him and DeGroot with all the information pertaining to the proceeds generated by the ADM Contract.  [*Id.* at 45:13–46:14].  On this call, Kennedy made it clear that NDC would invoice ADM and receive payment of the invoices from ADM directly—which is what the Agreement required.  [*Id.* at 45:18–46:14].  Stated differently, Kennedy told the Debtor to refrain from sending invoices to ADM and requesting payments from ADM; rather, she was supposed to send invoices to NDC, and then NDC would invoice ADM, collect the payments from ADM, and then send the Debtor her one-half share of the net profits as required under the Agreement.

**G.      E-mail Exchanges on October 17, 2013**

37.      Approximately one month after Kennedy e-mailed the Debtor about the details regarding the worked performed by the Debtor and the invoices that she had sent to ADM, Kennedy and the Debtor exchanged e-mails on October 17, 2013, regarding any subsequent work performed and invoices sent, as set forth below:

a.   On October 17, 2013, at 2:17 P.M., Kennedy sent an e-mail to the Debtor (and a copy to DeGroot) stating, "Are you available tomorrow to talk.  Did you get a chance to send us the details of what you have invoiced?  If not, please send." [Pl.'s Ex. 20].

b.   On October 17, 2013, at 2:47 P.M., the Debtor e-mailed Kennedy (and copied DeGroot) and confirmed that she had invoiced ADM $25,500.00.   [*Id.*]. Specifically, she provided, in part, that:

> ADM is on target --- 4 staff (Myself, Armi and temporary PM and have Jane Pierce in the pipeline to serve in advisory capacity on as needed basis)  Our monthly budget is approx. -- $20k with expected completion no later than 1/14.  2nd invoice went out Friday ---$25,500 to keep operations going for curriculum … Heavy customization for pilot 25 locations in 2013 / 1st qtr 2014.

[*Id.*].

c.   On October 17, 2013, at 3:07 P.M., the Debtor sent a second e-mail to Kennedy (and a copy to DeGroot) stating, in part, the following:

> Hi Dennis,
>
> For clarification purposes, the information requested is for ADM Diversity on Demand for Leadership Project.  Is that correct?
>
> If so, the monthly project management and expense reconciliation will be updated this weekend as tomorrow

(Friday, 10/18/13) is the end of the pay period.  This will provide an up to date picture of the project including budget, expenses, timelines, and estimated revenues or (net profit) upon completion.  So perhaps Monday or Tuesday of next week would be ideal if this is the information you are requesting.

At a glance:

Invoice 1 – $36,837.50 (billable hours) - Received

Invoice 2 - $25,500 (billable hours) plus $1,616 (reimbursable travel) – Pending

Monthly Project Staff and Resources – $20,000 (combined rate of $125 / hour)

Expenses to Date -- Pending

[*Id.*].

d.  On October 17, 2013, at 5:18 P.M., Kennedy sent an e-mail to the Debtor (and a copy to DeGroot), stating the following:

I am not sure why you decided to start invoices [sic] ADM.  We had been asking you for months on when we can send ADM an invoice.  Our agreement was always that we would invoice and distribute the money.  I will be reaching out to ADM next week regarding our agreement.  For all future invoices, please let Jason [DeGroot] know.  He will have an invoice sent.

In addition, we would like all moneies [sic] to be put into the NDC Bank Account for distribution.

[*Id.*].

e.  On October 17, 2013 at 5:41 P.M., the Debtor replied to Kennedy's e-mail  (and copied DeGroot), stating:

Really?

I'm not sure where you are coming from, so help me understand.  We have a 50/50 partnership which mean [sic] we share decisions equally, so help me understand

> where this is coming from now. Our agreement has always been 50/50 percent of the revenues on good faith which has been honored so what's going on? The ADM [C]ontract is not even in NDC's name, nor is any paid staff from the NDC conducting the work, so if you want the NDC to benefit from this project it might be helpful to help me better understand what the REAL issue is because right now it isn't making any sense.

[*Id.*].

f. On October 17, 2013, at 5:57 P.M., Kennedy sent an e-mail to the Debtor (and

a copy to DeGroot), stating the following:

> Carmen,
>
> Our agreement is that we would invoice and collect the money. That has always been our agreement. Our agreement is that you get 50% of the profits. You were never to invoice anyone especially without our knowledge. We had been asking you about when we can invoice ADM and you told us very soon. However, you had already invoiced them without our knowledge. I found out from ADM.
>
> I will be reaching out to ADM next week.

[*Id.*].

38.     By October 17, 2013, the Debtor still had not sent the proceeds from the ADM

Contract to NDC as she had promised she would do. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr.

46:23–47:6]. Indeed, she has never sent the funds to NDC. [*Id.* at 121:5-13]. Thus, NDC did not

receive any benefit from the ADM Contract. [*Id.* at 53:16-22]. At this point, NDC terminated its

relationship with the Debtor. [*Id.* at 52:8-15]. The Debtor had collected a total of $147,350.00

from the ADM Contract and deprived NDC of any benefit therefrom. [Pl.'s Ex. 16; Adv. Doc.

No. 24, Aug. 7, 2018, Trial Tr. 53:16-22, 120:9-11, 121:5-13].

**H.      The Recruiting Services Contract**

39.      On October 16, 2014—approximately one year after NDC terminated the Agreement—the Debtor, on behalf of Diversity on Demand (i.e., her own company), executed a contract to provide recruiting services to ADM (the "Recruiting Services Contract") in exchange for three equal payments of $7,945.00.  [Pl.'s Ex. 23].  The Recruiting Services Contract did not contain NDC's logo, name, or e-mail address.  [*Id.*].  After performing the services, ADM paid the Debtor only two installments of $7,945.00 each (totaling $15,890.00).  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 146:11-15].

**I.      The Harm to NDC Caused by the Debtor's Actions**

40.      Because NDC relied on the Debtor with respect to fulfilling her obligations pursuant to the Agreement, and because the Debtor breached the Agreement by failing to remit half of the proceeds to NDC, NDC had to lay off its contract employees because it did not have the cash flow to pay their salaries.  [*Id.* at 51:23–52:5].

41.      The Debtor was aware that NDC was operating at a loss because Kennedy had informed her that he really wanted to pay her a salary, but that NDC could not afford to do so because it had the ended the year with a loss.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 51:6-11, 138:13–139:12, 165:16-21; Def.'s Ex. 9].  If the Debtor would have performed under the Agreement and equally split the profits, NDC would have been able to fulfill its mission to increase its scope of participation in other states and improve its overall financial condition.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 51:12-18].

42.      The Debtor received a total of $176,740.00 from ADM that she did not subsequently split with NDC for three separate projects.  The TOWR Contract was $13,500.00

16

[Finding of Fact No. 27]; the ADM Contract was $147,350.00 [Finding of Fact No. 29]; and the Recruiting Services Contract was $15,890.00. [Finding of Fact No. 39].**8**

43.     NDC retained a lawyer to collect its share of the net profits from the Debtor pursuant to the Agreement for the services performed for ADM. [*See* Pl.'s Ex. 24]. On March 25, 2016, NDC's counsel sent a demand letter to the Debtor demanding that the Debtor pay to NDC its 50% share of the proceeds that the Debtor had collected. [*Id.*]. The Debtor did not comply with the instructions contained in the demand letter. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 144:13-15]. NDC's attempts to resolve the matter without court intervention were unsuccessful.

**J.     The State Court Lawsuit**

44.     On June 3, 2015, NDC sued the Debtor, and the suit was styled *National Diversity Council and Diversity & Leadership, Inc. v. Carmen M. Carter*, Cause No. 2015-31867, in the 234th District Court of Harris County, Texas (the "State Court Lawsuit"). [Adv. Doc. No. 1-1 at 2 of 7; Adv. Doc. No. 16 at 1 of 17]. NDC sought relief based upon, *inter alia*, the following claims: (1) the Debtor breached the Agreement; and (2) the Debtor defrauded NDC. [Adv. Doc. No. 16 at 1 of 17].

45.     On December 6–7, 2016, the State Court Lawsuit was tried to a jury. [Adv. Doc. No. 16 at 1 of 17].

46.     The jury in the State Court Lawsuit answered nine out of eleven questions:

> a.  Question No. 1 – Did Carter agree with National Diversity Council to split fifty percent (50%) of the profits for consulting and/or training services provided by Carter to National Diversity Council members?

---

8 It is important to note that the Agreement called for NDC to receive payment of the invoices from its members and then remit to the Debtor 50% of the net profits associated with these invoices. [Finding of Fact No. 14]. It is certainly possible that the invoices collected by the Debtor each represented 100% net profits, in which event NDC was entitled to 50% of each invoice amount. *See supra* note 3. However, it is also possible that there were expenses associated with these invoices such that the net profit was not the amount of the invoices but rather a lesser amount. Thus, the Debtor's absconding with 100% of these proceeds quite possibly harmed NDC more than it appears at first glance.

The jury answered yes.

b.   Question No. 2 – Did Carter fail to comply with the agreement?

The jury answered yes.

c.   Question No. 3 – What sum of money, if any, if paid now in cash, would fairly and reasonably compensate National Diversity Council for its damages, if any, that resulted from such failure to comply?

The jury answered $88,370.[9]

d.   Question No. 4 – Did Carmen Carter perform compensable work for National Diversity Council for which she was not compensated for the WI Women in Leadership Symposium and the LA Diversity Leadership Bootcamp?

The jury answered no to both questions.

e.   Question No. 5 – Did a valid express contract exist between National Diversity Council and Carmen Carter covering the services, if any, you found in response to Question No. 4?

The jury did not answer this question as instructed.

f.   Question No. 6 – What was the reasonable value of such compensable work at the time and place it was performed?

The jury did not answer this question as instructed.

g.   Question No. 7 – Did Carmen Carter commit fraud against National Diversity Council?

The jury answered yes.

---

[9] The figure of $88,370.00 represents 50% of $176,740.00—which is the aggregate amount of proceeds collected by the Debtor from ADM for the TOWR Contract, the ADM Contract, and the Recruiting Services Contract. [*See* Finding of Fact No. 42]. Even though the Debtor entered into the Recruiting Services Contract approximately one year after NDC terminated its relationship with her—i.e., one year after NDC terminated the Agreement—the jury in the State Court Lawsuit nevertheless made a finding that the Debtor's failure to remit 50% of the $15,890.00 that she received from the Recruiting Services Contract constituted a portion of the damages incurred by NDC. While this Court disagrees with this particular finding, the Court is nevertheless bound by it for purposes of finding that the amount of NDC's claim in the Debtor's main Chapter 7 case includes the $7,945.00 that the jury awarded to NDC. However, this Court concludes—for reasons subsequently stated herein—that this particular $7,945.00 portion of the judgment awarded in the State Court Lawsuit is a dischargeable debt.

h.  Question No. 8 – What was the sum of money, if any, if paid now in cash, would fairly and reasonably compensate National Diversity Council for their/its damages, if any, that resulted from such fraud?

The jury answered $80,425.**10**

i.  Question No. 9 – Do you find by clear and convincing evidence that the harm to National Diversity Council resulted from fraud?

The jury answered yes.

j.  Question No. 10 – What sum of money, if any, if paid now in cash, should be assessed against Carter and awarded to National Diversity Council as exemplary damages if any for the conduct found in response to Questions No. 7?

The jury answered zero.

k.  Question No. 11 – What is a reasonable fee for the necessary services of National Diversity Council's attorneys in this case, stated in dollars and cents?

The jury answered $99,110 for trial and preparation; $75,000 in the event of an appeal to the Court of Appeals; $35,000 in the event that they must petition for review in the Supreme Court of Texas; $60,000, in the event that they must brief the merits in the Supreme Court of Texas; and $15,000 in the event that they must argue before the Supreme Court of Texas.

[Pl.'s Ex. 25].

47.     After the jury made its findings, NDC expressly opted to select the breach of the Agreement finding in order to recover not only the economic damages of $88,370.00, but also the attorneys' fees.  [Adv. Doc. No. 16 at 1–2 of 17; Pl.'s Ex. 26].  Accordingly, on February 3, 2017,

---

[10] The record from the trial of the pending adversary proceeding is unclear as to why the jury in the State Court Lawsuit awarded NDC the sum of $80,425.00 for damages resulting from the Debtor's fraud when the same jury awarded damages of $88,370.00 to NDC for the Debtor's breach of the Agreement.  The difference between these two figures is $7,945.00—i.e., the amount that is 50% of the $15,890.00 that the Debtor received from the Recruiting Services Contract.  Apparently, the jury decided that the Debtor committed no fraud with respect to the Recruiting Services Contract—perhaps because NDC had terminated the Agreement the previous year—but did find that the Debtor breached the Agreement by entering into the Recruiting Services Contract (a finding with which this Court disagrees, *see infra* note 22).  As noted *supra* note 9, this Court disagrees with the jury on this particular finding.

the Harris County District Court (the "State Court") entered a judgment (the "Judgment") awarding NDC damages of $88,370.00 to bear interest at the prejudgment rate of 6% per annum from October 17, 2013, to February 3, 2017, which amounted to $17,421.47.[11] [Pl.'s Ex. 26]. The State Court also awarded attorneys' fees of $99,110.00. [*Id.*]. The total amount of the Judgment was therefore $204,901.47, and this amount bears interest at the rate of 5% per annum to accrue from the date of the Judgment until the sums owed are paid in full. [*Id.*].

**K.     The Debtor's Chapter 7 Case and the Pending Adversary Proceeding**

48.     On August 23, 2017, the Debtor filed a Chapter 7 petition initiating the main case (the "Petition Date"), and the Clerk of Court assigned case number 17-35082 to this main case. [Main Case No. 17-35082, Doc. No. 1].

49.     On November 17, 2017, NDC timely filed its original complaint initiating the instant adversary proceeding (the "Complaint"). [Adv. Doc. No. 1]. NDC did not request an award for reasonable attorneys' fees or pre- or post-judgment interest in the Complaint for prosecuting this adversary proceeding.

50.     On December 14, 2017, the Debtor filed her answer to the Complaint, [Adv. Doc. No. 7]; and on the same date, she also filed her first amended answer, which is the "live" pleading, [Adv. Doc. No. 8].

51.     On January 8, 2018, NDC filed a proof of claim in the main case. [Main Case No. 17-35082, Claim No. 7]. The proof of claim sets forth that as of the Petition Date, the amount of the Judgment, accrued unpaid interest, and accrued unpaid costs due were $204,901.47, $5,641.81, and $2,405.66, respectively—for a total amount of $212,948.94. [Main Case No. 17-35082, Claim

---

[11] October 17, 2013, is the date that NDC terminated the Agreement. [Finding of Fact No. 38]. When the State Court entered the Judgment, it obviously decided that prejudgment interest of 6% would begin to run on the date that NDC terminated the Agreement and accrue up to the date the Judgment was signed, which was February 3, 2017.

No. 7, Ex. 1].  Finally, the proof of claim sets forth that NDC is an unsecured creditor.  [Main Case No. 17-35082, Claim No. 7 at 2, ¶ 9].

52.     On July 20, 2018, NDC and the Debtor submitted a joint pretrial statement, and in this statement, NDC did not request attorneys' fees for the prosecution of this adversary proceeding or pre- or post-judgment interest.  [Adv. Doc. No. 16].

53.     The Court then held the trial on the Complaint on August 7–8, 2018.

### III.     CREDIBILITY OF THE WITNESSES

Three witnesses testified during the multi-day trial:  (1) Randolph Dennis Kennedy, the founder and chairman of NDC; (2) Carmen M. Carter, the Debtor/Defendant; and (3) Peter Jason DeGroot, the chief financial officer of NDC.  Set forth below are the Court's findings concerning the credibility of these witnesses.

**A.     Randolph Dennis Kennedy**

Kennedy testified on a variety of issues.  This Court finds Kennedy to be a very credible witness and gives substantial weight to his testimony.

**B.     Carmen M. Carter**

The Debtor testified on numerous issues.  This Court finds that the Debtor is not a credible witness and gives little weight to her testimony.  The Debtor frequently provided inconsistent testimony and also changed her testimony when she was caught being inconsistent, as she was impeached on several occasions by her deposition testimony and her testimony that she gave in the State Court Lawsuit.  Some examples of these inconsistencies are set forth below:

- **Deposition Impeachment 1 (Advertising)**:

|  |  |
|---|---|
| NDC's Counsel: | In the time frame of 2013 through 2015 you didn't do any advertising for your business. |

| | |
|---|---|
| The Debtor: | Yes, I did. |
| NDC's Counsel: | You did[?] |
| The Debtor: | Yes. |
| NDC's Counsel: | Ms. Carter, do you recall when I took -- when Mr. Fiddler took your deposition in 2016? |
| The Debtor: | (No audible response). |
| NDC's Counsel: | May I approach, Your Honor? |
| The Court: | Go ahead. |
| NDC's Counsel: | Do you recall Mr. Fiddler during your deposition in 2016? |
| The Debtor: | Yes. |
| NDC's Counsel: | And a-t that deposition you were under oath as well? |
| The Debtor: | Yes. |
| NDC's Counsel: | If you could turn to Page 27 of what I just handed you.  The very first line Mr. Fiddler asks you, Do you advertise, and your answer then was? |
| The Debtor: | It was no. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 101:21–102:14].

- **Deposition Impeachment 2 (Completion of the Work)**:

| | |
|---|---|
| NDC's Counsel: | You started the work reflected in this scope of work [for the ADM Contract], Plaintiff's Exhibit 16, in September of 2013. |
| The Debtor: | Yes. |

| | |
|---|---|
| NDC's Counsel: | And you finished the work in May of 2015. |
| The Debtor: | No, the work was never completed. |
| NDC's Counsel: | Do you recall -- can you turn to Page 124 of your deposition, please? |
| The Debtor: | Yes. |
| NDC's Counsel: | Page 124, Line 21, Mr. Fiddler asks you, Did you do the work that's reflected in the statement of work, and you answered? |
| The Debtor: | (No audible response). |
| NDC's Counsel: | Can you read Line 23, please? |
| The Debtor: | Absolutely. |
| NDC's Counsel: | And then Mr. Fiddler asks, When did you finish it, and your answer was? |
| The Debtor: | May of 2015. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 118:21–119:12].

- **Deposition Impeachment 3 (Total Amount of Revenue That She Received from ADM)**:

| | |
|---|---|
| NDC's Counsel: | In total you would agree that you received over $220,000.00 for this scope of work in both the fees and expenses. |
| The Debtor: | May I ask you a clarifying question? |
| NDC's Counsel: | I'm just asking you yes or no, you would agree with me that [you] received $220,000.00 from ADM pursuant to this scope of work. |
| The Debtor: | I'm not recalling the exact number. |
| NDC's Counsel: | May I approach, Your Honor? |
| The Court: | Go ahead. |

| NDC's Counsel: | Ms. Carter, do you recall that we had taken your deposition a second time after some discovery was supplemented in the trial court? |
| --- | --- |
| The Debtor: | Yes. |
| NDC's Counsel: | Could you turn to Page 7 of the Volume 2 of your deposition.  Line 1 through Line 3 you were asked, So, the total amount of revenue received from ADM on this, on the projects that you did from May of 2013 to the present would have been $219,565.57, and [your] answer was? |
| The Debtor: | It was yes. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 120:15–121:10].

- **Deposition Impeachment 4 (True Owner of the Proceeds)**:

| NDC's Counsel: | After that issue was raised, you -- and as we saw in the e-mails today, you were instructed by Mr. DeGroot and Mr. Kennedy to direct payment to Diversity and Leadership.  Do you recall seeing those e-mails today? |
| --- | --- |
| The Debtor: | Yes. |
| NDC's Counsel: | But you refused, that you admitted that the money actually belonged to National Diversity Council. |
| The Debtor: | No. |
| NDC's Counsel: | Ms. Carter, sorry to go back and forth, but if you can go to Page 134 of your deposition. |
| The Debtor: | Which book? |
| NDC's Counsel: | Of the deposition transcript, the first volume.  Thank you.  Actually, if we could start on Page 133, Line 19.  You're asked, But the money wasn't yours. And you |

|  | responded, It wasn't Diversity and Leadership's either. Diversity and Leadership was a competitor, why would I pay a competitor. And so then you were asked, So, you just kept it. What do you mean it was a competitor? Your response, You said, and I've learned this through the process that Diversity and Leadership is a for-profit business. I'm an independent consultant, they're our competitor. Why would I pay a competitor. And then you were asked, So, that's why you didn't pay the money to Diversity and Leadership. And what was your answer? |
| The Debtor: | I said, it belonged to the National Diversity Council. |
| The Court: | I couldn't hear. |
| The Debtor: | It belonged to the National Diversity Council. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 131:5–132:7].

- **Deposition Impeachment 5 (Reason for Non-payment)**:

| NDC's Counsel: | You've also claimed that you would have paid the National Diversity Council, but they sued you too soon. |
| The Debtor: | (No audible response). |
| NDC's Counsel: | Correct? |
| The Debtor: | I don't recall saying that where they sued me too soon. No, we dissolved the relationship in October 2013. |
| NDC's Counsel: | May I approach, Your Honor? |
| The Court: | Go ahead. |
| The Debtor: | Yes. |

| | |
|---|---|
| NDC's Counsel: | Go to your deposition, Page 136, Line 14, So why haven't you paid.  And then your answer to that was?  What did you say on Line 15, Ms. Carter? |
| The Debtor: | I said, I offered to pay but then you sued me.  May I add something to that? |
| NDC's Counsel: | There's not a question pending, Ms. Carter. |
| The Debtor: | Okay. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 135:1-17].

- **Deposition Impeachment 6 (Document Creation Date)**:

| | |
|---|---|
| NDC's Counsel: | But not as it's reflected in Exhibit 36.  You created this after the lawsuit was started? |
| The Debtor: | I actually have a spreadsheet.  This comes from a spreadsheet that I was creating for all the work and the timesheets that was linked to the individuals that are paying for it, yes. |
| NDC's Counsel: | My question is limited to Exhibit 36 only. Debtor's Exhibit 36 was created after the State Court [L]awsuit was filed. |
| The Debtor: | No.  The information for this -- the information for this spreadsheet was already captured. |
| The Court: | That's not what he's asking you, Ms. Carter. |
| The Debtor: | I'm sorry. I'm trying to understand. |
| The Court: | Oh, it's pretty easy.  He's asking you [about] this document, when did you create it? After the State Court [L]awsuit began or before it? |
| The Debtor: | It was before. |

| | |
|---|---|
| The Court: | She's answered your question. |
| NDC's Counsel: | May I approach, Your Honor? |
| The Court: | Yes. |
| NDC's Counsel: | Ms. Carter, if you could look at Volume 2 of your deposition testimony when we had to reopen your deposition when this document was presented. I would like you to go to page 5, line 8. You were asked to answer under oath.  "My question was whether any of these numbers -- ask you a different way.  Were any of these numbers on this document before the [State Court] [L]awsuit was filed?"  And your answer was? |
| The Court: | "In January." |
| NDC's Counsel: | Page 5.  Can you read your response in line 12? |
| The Debtor: | (No audible response.) |
| NDC's Counsel: | It's one word. |
| The Debtor: | "No." |

[Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 59:12–60:20].

- **State Court Impeachment 1 (Refusal to Pay Proceeds from ADM Contract):**

| | |
|---|---|
| Plaintiff's Counsel: | You wanted not only the 50 percent contracted amount but you wanted $100 an hour as well for every hour you worked on the contract. |
| The Debtor: | I did the work, yes, I'd like to get paid for my work. |
| Plaintiff's Counsel: | You also admitted that there were profits from the ADM work but still refused to pay. |
| The Debtor: | I don't recall. |

Plaintiff's Counsel:   If you go back to your trial testimony, Page 21, Line 23, Ms. Carter.  But then you admit later that there were net profits from the money that you received from ADM.  Right?  And your response was, Yes.  And you were asked, And you still didn't pay the NDC.  No.  Question, Or [D & L].  Answer, Absolutely not.  Did I read that right?

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 132:22–133:9].

The above-referenced examples underscore the Debtor's lack of credibility.  It strains credulity, for example, that the Debtor at trial in this adversary proceeding testified that she did in fact  advertise her business between 2013 and 2015, and yet, at her deposition, she testified that she did not advertise.

In addition to her lack of testimonial credibility, the Court also notes that the Debtor has failed to include required information relating to her employment and current income on her bankruptcy schedules.  Her false statements and omissions on her bankruptcy schedules directly contradict her sworn testimony at trial.  In the Debtor's Schedule I, which she signed under oath, she represents that she is self-employed; however, she has failed to disclose the relevant information pertaining to her self-employment, including:  (1) the name of the company; (2) the address of the company; and (3) the length of employment at this company.  [Main Case No. 17-35082, Doc. No. 1 at 26 of 47].  At trial, the Debtor testified that she owns and operates three companies (i.e., Inside Diversity, LLC, Diversity on Demand, and Diversity on Demand for Leadership).  [Finding of Fact No. 8].  Nevertheless, she did not disclose this information on her schedules.  [Main Case No. 17-35082, Doc. No. 1 at 26 of 47].

Moreover, the Debtor has also failed to disclose on her schedules that she has been employed by the University of Phoenix as a full-time professor for 13 years.[12]  [*Id.*; Finding of Fact No. 7].  In the Debtor's Schedule I, which the Debtor signed under oath, she indicated that she is self-employed under the occupation section of the document.  Yet, at trial, she testified that she had been employed by the University of Phoenix since 2005.  [*See* Finding of Fact No. 7].  Being employed at the University of Phoenix is not self-employment.  Therefore, she made a material misstatement under oath.

Finally, the Debtor disclosed only three sources of income on her Statement of Financial Affairs:  (1) "Financial assistance from family," which was $9,375.00; (2) "Family Support," which was $5,893.00; and "Self-Employment," which was $0.00—none of which evidence her ownership interest in the three sole proprietorship companies or her full-time profession as a professor, and the related income from these various sources.  [Main Case No. 17-35082, Doc. No. 1 at 32 of 47].  Her failure to disclose these other sources of income is a blatant and material omission.

All in all, these false statements and omissions unequivocally demonstrate that the Debtor has perjured herself by submitting false oaths.[13]  *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005) (holding that the debtor perjured himself by omitting information

---

[12] Schedule I states as follows: "Fill in your employment information.  If you have more than one job, attach a separate page with information about additional employers.  Include part-time, seasonal, or self-employed work.  Occupation may include student or homemaker, if it applies."  [Main Case No. 17-35082, Doc. No. 1 at 26 of 47].

[13] The Court emphasizes that the Debtor signed her Schedules under the penalty of perjury.  The specific language in the Schedules is as follows:  "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."  [Main Case No. 17-35082, Doc. No. 1 at 30 of 47].  The Court further emphasizes that the Debtor signed her SOFA under the penalty of perjury.  The specific language in the SOFA is as follows: "I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571."  [Main Case No. 17-35082, Doc. No. 1 at 37 of 47].

and affirmatively making false statements that the undisclosed information did not exist).  Any debtor who files a bankruptcy petition has a continuous, affirmative duty to disclose required information, including, *inter alia*, current income and a statement of financial affairs.  *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir. 1999).  "False oaths may be in the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings."  *In re Gartner*, 326 B.R. at 367 (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).  Indeed, here, the Debtor has perjured herself on numerous occasions.  Stated differently, by omitting the information that she did, the Debtor affirmatively made false statements that the undisclosed information did not exist.  *See West v. Family Express Corp. (In re Bilstat, Inc.)*, 314 B.R. 603, 610 (Bankr. S.D. Tex. 2004).  Thus, the information omitted in the Schedules and the Statement of Financial Affairs, along with the conflicting testimony the Debtor gave at trial (compared to her deposition testimony), cast a large pall on the Debtor's credibility.  Given the impeachment of the Debtor at trial on key issues, plus her material misrepresentations in her Schedules and Statement of Financial Affairs, this Court finds that the Debtor is not a credible witness.  The Court therefore gives little weight to her testimony.

## C.     Peter Jason DeGroot

DeGroot testified at the trial about NDC's dealings with the Debtor and about his own communications with the Debtor relating to the Agreement, particularly with respect to the invoicing and how payments on invoices were supposed to be collected by NDC.  This Court finds DeGroot to be a very credible witness and gives substantial weight to his testimony.

## IV.   CONCLUSIONS OF LAW

### A.   Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11."  District courts may, in turn, refer these proceedings to the bankruptcy judges for that district.  28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This adversary proceeding is a core proceeding because it is a suit to determine the dischargeability of a specific debt pursuant to 28 U.S.C. § 157(b)(2)(I) and Rules 7001(6) and 4007.  This suit is also a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2) because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.  *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)).  Preventing the discharge of a specific debt—here, the amount owed under the Judgment—can only occur in a bankruptcy court.  There is no state law equivalent for this action.

### B.   Venue

Venue is proper under 28 U.S.C. § 1409(a).  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced

in the district court in which such case is pending." The Debtor's main Chapter 7 case is presently pending in this Court; therefore, venue of this adversary proceeding is proper.

## C.     Constitutional Authority to Enter a Final Order

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' authority to enter final orders. 564 U.S. 462, 503 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it. The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final order in the suit at bar.

In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendants. *Id.* at 468. *Stern* involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C). *Id.* at 471. The Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. Here, the pending dispute before this Court is not a counterclaim by the Debtor brought pursuant to state law, but rather is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) brought by a judgment creditor (i.e., NDC) against the Debtor to determine the nondischargeability of a specific debt (i.e., the Judgment) pursuant to §§ 523(a)(2)(A) and (a)(6). The ruling in *Stern* was only limited to the one specific type of core proceeding involved in that dispute, which is not implicated here. Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here. *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy

judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis)*, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . . We decline to extend *Stern*'s limited holding herein.").  Therefore, this Court has the constitutional authority to enter a final order in this adversary proceeding.

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.  In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the claims brought by NDC are based *primarily* on express provisions of the Bankruptcy Code—§§ 523(a)(2) and (a)(6)—and judicially-created bankruptcy law interpreting these provisions.  This Court is therefore constitutionally authorized to enter a final order in this adversary proceeding.

Finally, in the alternative, this Court has the constitutional authority to enter a final order because NDC and the Debtor have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be express.  We disagree.  Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.  Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").  Indeed, NDC filed its Complaint and explicitly stated that

"Plaintiff consents to the entry of final orders or judgment of the Bankruptcy Court." [Adv. Doc. No. 1 at 2 of 9, ¶ 1.5]. In the Debtor's first amended answer, she does not specifically state that she consents to the entry of a final order by this Court, but rather she sets forth that: "The allegations in section . . . 1.5 are admitted." [Adv. Doc. No. 8 at 1 of 4, ¶ 1]. Stated differently, the Debtor never expressly objected to this Court entering a final order in her first amended answer. [*Id.*].[14]

The Debtor's active participation in this adversary proceeding demonstrates that she consents to the entry of this Court entering a final order. First, the Debtor filed her Chapter 7 petition shortly after the jury verdict in the State Court Litigation. Thereafter, NDC initiated this adversary proceeding, and the Debtor has never given any indication that she objects to this Court's authority to issue a final order regarding whether the Judgment is non-dischargeable. Indeed, the Debtor has filed an answer (and a first amended answer) to the Complaint. In these pleadings, the Debtor has never objected to this Court's authority to enter a final order. Moreover, the Debtor participated in a two-day trial in this Court, and not once did she ever object to this Court's constitutional authority to enter a final order. If these circumstances do not constitute consent— at least implied, if not express—then nothing does. Under all of these circumstances, this Court concludes that both of the parties have consented to this Court entering a final order as to whether the Judgment is a non-dischargeable debt.

---

[14] For clarification purposes, in the Complaint, NDC set forth the following: "Plaintiff consents to the entry of final orders or judgment of the Bankruptcy Court." [Adv. Doc. No. 1 at 2 of 9, ¶ 1.5]. In her first amended answer, the Debtor admitted this allegation. Thus, the Debtor admitted that NDC consents to this Court entering a final order, but she herself never stated expressly that she consents or does not consent. [Adv. Doc. No. 8 at 1 of 4, ¶ 1].

### D.    Collateral Estoppel

As a prerequisite to the Court's discussion regarding the dischargeability of the Judgment, the Court must first determine whether the Debtor is collaterally estopped from challenging the jury's verdict in the State Court Lawsuit.

NDC contends that the Debtor is collaterally estopped from re-litigating issues pertaining to (1) the Agreement, (2) the breach of the Agreement, and (3) the amount of damages because these issues were fully and fairly litigated in the State Court Lawsuit.  [Adv. Doc. No. 16 at 3 of 17; Tape Recording, Aug. 2, 2018, Hrg. at 10:26:53–10:29:54 A.M.].  NDC also contends that these facts were essential to the Judgment, and the parties to this adversary proceeding were the same parties in the State Court Lawsuit.[15]  [Adv. Doc. No. 16 at 3 of 17].  The Debtor disagrees with NDC's position and asserts that collateral estoppel does not apply to these three issues because the Agreement only applied to workshops, presentations, and conferences.  [*Id.*].  Furthermore, the Debtor asserts that the Agreement did not encompass the services that she was going to provide to ADM, and therefore, she could not have possibly breached the Agreement.  [*Id.*].  Moreover, the Debtor argues that she did not breach the Agreement because she contracted with NDC (a nonprofit entity)—and not D & L (a for-profit entity)—and the ADM Contract was a for-profit project, which made it impossible to perform under the Agreement.  [*Id.*].  Due to the nature of the Agreement, the Debtor argues that Kennedy was aware that she, on behalf of her own company, i.e., Diversity on Demand, was going to provide ADM with services that were not

---

[15] The Court notes that NDC did not file a motion for summary judgment requesting this Court to rule that there are no genuine issues of material fact to try on the issues of whether the Agreement existed, whether the Debtor breached the Agreement, and whether damages flowed from the breach of the Agreement.  NDC's counsel first raised the collateral estoppel argument at the pretrial conference.  [Tape Recording, Aug. 2, 2018, Hrg. at 10:34:35–10:35:30 A.M.]

offered pursuant to the Agreement (i.e., equal employment opportunity organizational development, curriculum, and instructional design work).  [Adv. Doc. No. 16 at 3–4 of 17].

The Debtor's arguments lack merit.  The Supreme Court has "previously recognized that the judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 480–81 (1982).  One purpose of collateral estoppel is to prevent the relitigation of issues actually litigated and resolved in a prior proceeding. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).  An issue was "actually litigated" if it was "raised, contested by the parties, submitted for determination by the court, and determined." *Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 456 (5th Cir. 2016) (internal quotation and citation omitted).  According to the Supreme Court, the parties should be permitted to relitigate issues only "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Kremer*, 456 U.S. at 487 (quoting *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979)); *Lindsey v. Prive Corp.*, 161 F.3d 886, 891 (5th Cir. 1998) (quoting *Montana v. United States*, 440 U.S. at 164 n.11)).

Moreover, when an issue has been submitted to a state court for determination, then that state's collateral estoppel law applies to the proceeding in the bankruptcy court.  *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997).  Here, because the Judgment was entered by a Texas state court, Texas rules of preclusion apply.  The Fifth Circuit has stated that under Texas law, a party who seeks to invoke the doctrine of collateral estoppel must establish: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Park v. Chang (In re Park)*, 271 F. App'x 398, 400 n.5 (5th

Cir. 2008) (quoting *Garner v. Lehrer (In re Garner)*, 56 F.3d 677, 679 (5th Cir. 1995)).  In the suit

at bar, the Court must apply the rules of preclusion to each cause of action raised in the State Court

Lawsuit:  i.e., (1) the breach of contract claim; and (2) the fraud claim.

      1.    <u>Collateral Estoppel Applies to NDC's Breach of Contract Claim Litigated in the</u>
               <u>State Court Lawsuit</u>

The Debtor is collaterally estopped from re-litigating the breach of the Agreement claim.

All of the essential elements of the breach of contract claim were necessarily decided in the State

Court Lawsuit.  Indeed, the jury expressly found the following:  (1) that NDC and the Debtor

entered into the Agreement; (2) the Debtor subsequently breached the Agreement; and (3) the

damages from the Debtor's breach of the Agreement were $88,370.00.  [Finding of Fact No. 46].

The Debtor's attempt now to raise these particular issues before this Court wholly undermines the

purpose of the collateral estoppel doctrine.[16]  This Court must give full faith and credit to the jury's

findings and the Judgment in the State Court Lawsuit.  *Kremer*, 456 U.S. at 462–63 ("As one of

its first acts, Congress directed that all United States courts afford the same full faith and credit to

state court judgments that would apply in the State's own courts."); *Parklane*, 439 U.S. at 336 n.23

("Collateral estoppel does not involve the 're-examination' of any fact decided by a jury.  On the

contrary, the whole premise of collateral estoppel is that once an issue has been resolved in a prior

proceeding, there is no further factfinding function to be performed.").  Here, NDC's breach of

contract claim was fully and fairly adjudicated in the State Court Lawsuit; NDC and the Debtor

were certainly adverse parties in this suit; the jury found the Debtor liable for breaching the

---

[16] The Debtor also seems to argue that even if the State Court Lawsuit decided the issue that a contract existed, this agreement was only between her and NDC, not D & L.  This Court rejects this suggestion and finds that the contract that was found to be enforceable in the State Court Lawsuit (defined in this Memorandum Opinion as "the Agreement") was not only between the Debtor and NDC, but also between the Debtor and D & L.  Finally, to the extent that the State Court Lawsuit left any doubt about this issue, this Court finds that based upon the evidence introduced at the trial in this adversary proceeding, the Agreement was not only between the Debtor and NDC, but also between the Debtor and D & L.

Agreement in the amount of $88,370.00; and the jury's findings were essential to the State Court's entry of the Judgment. [Finding of Fact Nos. 44–47]. Therefore, this Court finds that collateral estoppel completely bars relitigation of the breach of contract claim because the facts were fully and fairly litigated in the State Court Lawsuit.

The question now is whether collateral estoppel bars the Debtor from litigating whether she willfully and maliciously injured NDC or defrauded NDC by her conduct. This Court concludes that she is not estopped from litigating these issues.

    2.    <u>Collateral Estoppel Does Not Apply to Any of NDC's § 523(a) Claims in this Adversary Proceeding</u>

The Court first addresses whether collateral estoppel applies with respect to NDC's claim under § 523(a)(6), as this is the easier of the two provisions to analyze given the facts here.

    **a.    The Debtor is Not Collaterally Estopped from Litigating the Issue that She Did Not Willfully and Maliciously Injure NDC**

In the State Court Lawsuit, the jury never made a finding that NDC was damaged by any conduct of the Debtor that was "willful and malicious." Indeed, there was no charge to the jury that even used the words "willful" and "malicious." In fact, the jury charge asked whether exemplary damages should be imposed—which it should be noted, the jury answered in the negative, [Finding of Fact No. 46(j)]—and this charge did not include the term "malicious and willful" (or even the term "malicious") in defining the meaning of the term "exemplary." Under these circumstances, this Court finds that in the State Court Lawsuit, whether the Debtor's conduct was "willful and malicious" was never fully and fairly litigated; indeed, it was not litigated even to some extent. Accordingly, this Court concludes that the Debtor is not barred by collateral estoppel from contending in this adversary proceeding that her conduct was not willful and malicious. *Compare Plains Seafood, Inc. v. Thomason (In re Thomason)*, No. 17-10164-RLJ7,

2018 WL 4354376, at *3 (Bankr. N.D. Tex. Sept. 11, 2018) (holding that a debt arising from a state court judgment was non-dischargeable under § 523(a)(6) because the jury expressly and unanimously determined that the injury resulted from malice), *with Gilbert v. Dang (In re Dang)*, No. 14-36790, 2015 WL 6689316, at *6 (Bankr. S.D. Tex. Oct. 30, 2015), *rev'd on other grounds*, 560 B.R. 287 (S.D. Tex. 2016) ("Although Question No. 15 of the jury charge asked if the Plaintiffs' injury resulted from 'malice' on the part of the Debtors, the jury did not answer the question.  Without an express finding that the conduct of the Debtors was 'willful and malicious,' the Plaintiffs are not entitled to summary judgment on their § 523(a)(6) claim.").

### b.  The Debtor is Not Collaterally Estopped from Litigating the Issue that She Did Not Make Any False Representations, Obtain Money Under False Pretenses, or Defraud NDC

Next, the Court addresses whether collateral estoppel applies with respect to NDC's claims under § 523(a)(2)(A).  Unlike NDC's § 523(a)(6) claim, NDC's § 523(a)(2)(A) claims, at first blush, would seem to have collateral estoppel on its side.  This is so because the jury charge, in asking the jury whether the Debtor committed fraud, actually gave the jury two definitions of "fraud" so that the jury could answer the issue.[17]  These two definitions of "fraud" set forth

---

[17] The jury charge includes two definitions of fraud.  The first definition of fraud is defined as follows:

> Fraud occurs when (1) a party fails to disclose a material fact within the knowledge of that party, and (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and (3) the party intends to induce the other party to take some action by failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

[Pl.'s Ex. 25 at 9].  The second definition of fraud is defined as follows:

> Fraud occurs when (1) a party makes a material misrepresentation, and (2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and (3) the misrepresentation is made with the intention that it should be acted on by the other party, and (4) the other party relies on the misrepresentation and thereby suffers injury.

[*Id.*].  The jury charge explains that the term "misrepresentation" means "a) a false statement of fact; or b) a promise of future performance made with an intent, at the time the promise was made, not to perform as promised."  [*Id.*].

39

elements that are very similar, if not the same, as the elements that plaintiffs prosecuting §

523(a)(2)(A) actions must prove to be successful.  Based upon these definitions, the jury, in

answering whether the Debtor committed fraud, answered, "Yes."  Thus, it is arguable that

collateral estoppel now bars the Debtor from taking the position in this Court that she did not

commit fraud.

Case law, however, leads this Court to reject NDC's position.  Indeed, an opinion authored

by a District Judge from the Southern District of Texas—the Honorable Lee H. Rosenthal—binds

the undersigned judge and requires this Court to hold that collateral estoppel is inapplicable as to

NDC's 523(a)(2) claim.  *Walker v. Directory Distrib. Assocs., Inc.* (*In re Directory Distrib.

Assocs.)*, 566 B.R. 869, 877 (Bankr. S.D. Tex. 2017) (citing *In re DePugh*, 409 B.R. 125, 131 n.5

(Bankr. S.D. Tex. 2009) (holding that a decision from the District Court in the Southern District

of Texas is binding on a Bankruptcy Court in the Southern District of Texas)).

In *Dang v. Gilbert (In re Dang)*, 560 B.R. 287 (S.D. Tex. 2016), the plaintiff, pre-petition,

sued the debtors in state court, alleging both fraud and other bad conduct.  The jury awarded the

plaintiffs damages exceeding $1.5 million after first finding that the debtors had committed both

fraud and other unconscionable conduct.  *In re Dang*, 560 B.R. at 289.  The debtors then filed for

Chapter 7, and the plaintiffs filed an adversary proceeding seeking to prevent discharge of the $1.5

million judgment based upon §§ 523(a)(2) and (a)(6).  *Id.*  The plaintiffs then filed a motion for

summary judgment and argued that based upon the findings of the jury that the debtors had

committed fraud—fraud was expressly defined in the same two respects as in the State Court

Lawsuit here—collateral estoppel should apply.  *Id.* at 290.  The bankruptcy court—specifically,

the undersigned judge—rejected the plaintiffs' collateral estoppel argument as to § 523(a)(6)

because the jury had made no findings that the debtors had committed willful and malicious

conduct. *Id.* at 293. However, the undersigned judge accepted the plaintiffs' argument that collateral estoppel did apply to their § 523(a)(2) claim because of the specific finding by the jury that the debtors had committed fraud (based upon definitions tracking the elements required to be proven in a § 523(a)(2) action). *Id.* at 292–93. Additionally, the undersigned judge accepted the plaintiffs' argument due to the fact that the jury and state court judge had "rigorously considered" the issue of whether the debtors had committed fraud. *Id.* at 293. Thus, the undersigned judge granted the plaintiffs' motion for summary judgment and entered an order that the judgment issued by the state court judge was a non-dischargeable debt under § 523(a)(2). *Id.* at 290.

The debtors appealed this ruling, and the District Court reversed. *Id.* at 289. Judge Rosenthal's ruling was based upon her conclusion that the second prong of collateral estoppel—"those facts were essential to the judgment in the first action"—was not satisfied:

> In analyzing the second prong, whether the facts were essential to the judgment, Texas follows the RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment i., which states that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 722 (Tex. 1990). "The rationale for this rule is that an alternative may not have been as rigorously considered as it would have been if necessary to the result, and the losing party may be dissuaded from appealing one determination because of the likelihood that the other will be upheld." *Id.* When a jury awards damages on alternative grounds, issue preclusion does not apply to either ground. In that circumstance, a bankruptcy court must hold an evidentiary hearing to decide dischargeability and apportion damages if some result from a nondischargeable debt. []*Schwager* [*v. Fallas (In re Schwager)*], 121 F.3d 177, 184 (5th Cir. 1997).

*Id.* at 291.

Application of *In re Dang* to the suit at bar precludes this Court from applying collateral estoppel to NDC's § 523(a)(2)(A) claim for fraud. Stated differently, the Debtor is not barred from litigating in this adversary proceeding the issue as to whether she committed fraud. First, just like the jury in *In re Dang*, the jury here awarded damages to NDC on alternative grounds:

damages of $88,370.00 were awarded for the Debtor's breach of the Agreement and damages of $80,425.00 were awarded for the Debtor's fraud.  [Finding of Fact No. 46].  Granted, in *In re Dang*, the jury awarded only one damage figure (i.e., approximately $1.5 million) but, like the jury in the State Court Lawsuit here, it answered that damages flowed due to alternative grounds (i.e., unconscionable conduct under the Texas Deceptive Trade Practices Act, on the one hand, and fraud, on the other).  The fact that the jury here actually awarded two different damage figures for each ground—$88,370.00 for breach of the Agreement and $80,425.00 for fraud—does not sufficiently distinguish the suit at bar from *In re Dang* to allow application of collateral estoppel here.  [Finding of Fact No. 46].  Indeed, here, unlike the judgment in *In re Dang*, the Judgment from the State Court Lawsuit awarded NDC the breach of contract damages of $88,370.00, **not** the fraud damages of $80,425.00.  [*Id.*].  In fact, in the State Court Lawsuit, after the jury made its findings, NDC expressly opted to select the breach of contract damages in order to recover not only economic damages, but also its attorneys' fees.  [Finding of Fact No. 47].  Thus, the jury's finding that the Debtor committed fraud was not essential to the Judgment—which means that the second prong of collateral estoppel is not satisfied.

This Court also notes that in *In re Dang*, the District Court expressly rejected the undersigned judge's ruling that even if the jury's fraud determination was not essential to the judgment, the "rigorously considered" exception applied because the jury, in a two-day trial, rigorously considered the fraud issue and found that the debtors had committed fraud.  *In re Dang*, 560 B.R. at 294.  Here, the jury in the State Court lawsuit, just like the jury in *In re Dang*, sat through a multi-day trial and, after due deliberation, found that the Debtor had committed fraud.  [Finding of Fact No. 46(g)].  However, the undersigned judge discerns no material difference between the extent of deliberation that the jury did here versus the extent of deliberation that the

jury in *In re Dang* undertook.  Accordingly, bound by the District Court's opinion in *In re Dang*, the undersigned judge will not invoke the "rigorously considered" exception to the general rule that "[w]hen a jury awards damages on alternative grounds, issue preclusion does not apply to either ground."  *In re Dang*, 560 B.R. at 291.  "In that circumstance, a bankruptcy court must hold an evidentiary hearing to decide dischargeability and apportion damages if some result from a nondischargeable debt."  *Id.* at 291 (citing *In re Schwager*, 121 F.3d at 184).

In sum, the Debtor is estopped from denying that:  (1) she entered into the Agreement; (2) she breached the Agreement; (3) the damages to NDC from her breach of the Agreement totaled $88,370; and (4) the State Court entered the Judgment against her.[18]  However, the Debtor is not estopped from contending that the Judgment is a dischargeable debt that does not fall within § 523(a)(2)(A) and § 523(a)(6).  Accordingly, this Court, having held an evidentiary trial, now decides the issue of dischargeability of the Judgment.

---

[18] Arguably, the *In re Dang* holding prevents NDC from using collateral estoppel to bar the Debtor from relitigating the issues of whether she entered into the Agreement, whether she breached the Agreement, and whether her breach caused damages of $88,370.00 to NDC.  This argument exists because *In re Dang* held that collateral estoppel cannot apply when a jury awards damages on alternative grounds and here, the jury in the State Court Lawsuit did, in separate answers, award $88,370.00 for breach of the Agreement and $80,425.00 for the Debtor's fraud.  However, in the matter at bar, the Judgment from the State Court Lawsuit was based solely on the breach of the Agreement claim (and therefore the damages flowing therefrom) whereas, in *In re Dang*, the judgment resulted from two alternative determinations—one based on dischargeable damages and one based on non-dischargeable damages.  Thus, the judgment from *In re Dang* actually incorporated two alternative grounds for liability whereas the Judgment here does not.  Indeed, in the State Court Lawsuit, after the jury made its findings, NDC expressly opted to select the breach of the Agreement finding in order to recover not only the economic damages, but also the attorneys' fees.  [Adv. Doc. No. 16 at 5].  This is an important distinguishing fact that makes the facts determined by the jury—which led the State Court to issue the Judgment—immune from collateral attack in this Court.  To the extent that this Court is incorrect, the Court nevertheless finds, based upon the record made in this adversary proceeding that:  (1) the Debtor entered into the Agreement; (2) the Debtor breached the Agreement; and (3) the Debtor's breach of the Agreement caused damage to NDC.

E.     **Dischargeability of Debt Under 11 U.S.C. § 523(a)**

In an adversary proceeding to determine the dischargeability of a debt under § 523(a), the plaintiff/creditor bears the burden of proving the elements by a preponderance of the evidence.[19] *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 284 (1991)); *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945 (5th Cir. 2009); *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); Fed. R. Bankr. P. 4005.   "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997) (citing *Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. 1982)).   However, the Code affords relief only to the "honest but unfortunate debtor," and an individual may not obtain a discharge of debts incurred through his own wrongful conduct.   *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *Turbo Aleae Invs., Inc. v. Borschow (In re Borschow)*, 467 B.R. 410, 417 (W.D. Tex. 2012).   As the Fifth Circuit has so aptly stated:   "Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect victims of fraud." *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 319 (5th Cir. 2005).   As set forth below, NDC has met its burden of proving the elements of all of its claims under 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6).

F.     **Description of the Debt that National Diversity Council Asserts Should Not Be Discharged**

The Court's analysis begins by noting that it does not need to determine the amount of the debt at issue.  Based upon the jury's answers in the State Court Lawsuit, there is no question that:

---

[19] "A fact is proven by preponderance of the evidence if the finder of fact, here the court, finds it more likely than not, based on the evidence, that the fact is true." *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 736 (Bankr. S.D. Tex. 2017) (quoting *Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010)).

(1) Pursuant to the Agreement, the Debtor and NDC agreed to split 50% of the profits for consulting and/or training services provided by the Debtor to NDC's members, [Finding of Fact No. 46(a)]; (2) the Debtor failed to comply with the Agreement, [Finding of Fact No. 46(b)]; (3) NDC was awarded $88,370.00 for its damages that resulted from the Debtor's failure to comply with the Agreement,[20] [Finding of Fact No. 46(c)]; and (4) NDC was awarded attorneys' fees of $99,110.00 for trial and preparation, [Finding of Fact No. 46(k)].  There is also no question that the amount which the Debtor owes to NDC under the Judgment as of the Petition Date is $212,948.94.  [Finding of Fact No. 51].  The question is whether all or a portion of this debt is non-dischargeable.  It is non-dischargeable under § 523(a)(2)(A) if NDC has proven that the Debtor obtained the net profits from the ADM contracts through false representations, false pretenses, or actual fraud.  It is non-dischargeable under § 523(a)(6) if NDC has proven that the Debtor willfully and maliciously injured NDC by not paying its share of the net profits from the TOWR Contract, the ADM Contract, and the Recruiting Services Contract.

This Court concludes that with respect to the Recruiting Services Contract, the $15,890.00 that the Debtor collected from that contract—$7,945.00 of which the jury found should have been remitted to NDC by the Debtor—is a dischargeable debt because the Agreement was no longer in effect at the time that the Debtor and ADM entered into the Recruiting Services Contract.  Indeed, Kennedy himself testified that he terminated NDC's relationship with the Debtor on October 17, 2013.  [Finding of Fact No. 38].  Moreover, there was no covenant-not-to-compete prohibiting the

---

[20] The jury awarded contractual damages of $88,370.00 because it concluded that the Debtor pocketed $176,740.00 from the payments that she received from ADM on the TOWR Contract ($13,500.00), the ADM Contract ($147,350.00), and the Recruiting Services Contract ($15,890.00).  [Finding of Fact Nos. 42, 46].  The figure of $88,370.00 represents the 50% share under the Agreement that the jury found the Debtor should have remitted—but did not—to NDC.  [Finding of Fact No. 46(c)].

Debtor from competing with NDC after NDC terminated the Agreement.[21]  [Finding of Fact No.

18].  On October 16, 2014—one year after NDC terminated the Agreement—the Debtor, on behalf

of Diversity on Demand, executed the Recruiting Services Contract.  [Finding of Fact No. 39].

Unlike the TOWR Contract and the ADM Contract, the Recruiting Services Contract did not

include NDC's logo, name, or e-mail address; indeed, this contract should not have included

NDC's logo, name, or e-mail because NDC had terminated its relationship with the Debtor the

previous year.  [Finding of Fact No. 38].  Thus, the Debtor was legally within her right to negotiate

her own contract with ADM.  At the trial in this adversary proceeding, NDC introduced no

persuasive evidence to prove that the Debtor committed any acts with respect to the Recruiting

Services Contract that make the $15,890.00 (or any portion thereof) a non-dischargeable debt

under § 523(a)(2)(A) or § 523(a)(6).[22]

Therefore, the Court will focus only on whether the monies the Debtor pocketed from the

TOWR Contract and the ADM Contract—which certainly resulted in the issuance of the

---

[21] *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201–02 (Tex. 2002) ("If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement . . . . The plaintiffs did not do so in this case."); *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("An employer who wishes to restrict the post-employment competitive activities of a key employee may seek to accomplish that goal through a non-competition agreement."); *Procom Servs. v. Deal*, No. Civ.A. 302CV0600BF, 2003 WL 298752, at *9 (N.D. Tex. Feb. 11, 2003) ("Furthermore, Crews and Leitch admit that the Contract did not prevent the independent contractors from (1) starting their own businesses, (2) competing with Procom, and (3) starting or working for a competing business.  Finally, the Contract provided that the independent contractors have no contractual obligations to Procom following termination of their Contracts, other than 'to return all materials, resources, contracts . . . tools, equipment, . . . [and] moneys' to Procom.") (internal citation omitted).

[22] At trial in the State Court, the jury obviously decided that the Debtor's entering into the Recruiting Services Contract was a violation of the Agreement.  [*See* Finding of Fact No. 46 (c)].  On this point, this Court disagrees with the jury.  The Debtor entered into the Recruiting Services Contract approximately one year after NDC terminated the Agreement.  Hence, the Debtor was no longer bound by the Agreement, which in turn meant that no damages could flow to NDC.  That said, this Court is bound by the jury's finding so there is no question that the amount of the Judgment—and therefore the amount of the claim for NDC in the Debtor's main Chapter 7 case—includes the damages of $7,945.00 that the jury awarded NDC due to the Debtor's failure to remit 50% of the proceeds from this particular contract to NDC.  Nevertheless, it is this Court's duty to determine what amount of the Judgment is dischargeable and what amount is non-dischargeable, and this Court concludes that $7,945.00 of the $88,370.00 awarded in the Judgment is dischargeable.  Stated differently, the Debtor did not incur the liability of $7,945.00 due to any § 523(a)(2)(A) conduct or § 523(a)(6) conduct.

Judgment—are dischargeable or non-dischargeable debts.  The Court will address NDC's claims in the following order: § 523(a)(2)(A) for false representations; § 523(a)(2)(A) for false pretenses; § 523(a)(2)(A) for actual fraud; and § 523(a)(6) for willful and malicious injury.

**G.     National Diversity Council's Claim Under § 523(a)(2)(A) for False Representations**

NDC's first claim against the Debtor is based upon 11 U.S.C. § 523(a)(2)(A) for false representations.  NDC contends that the Debtor obtained the net profits from the TOWR Contract and the ADM Contract through false representations.  To obtain a judgment that a debt is non-dischargeable for false representations, the misrepresentations must have been:  (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party.  *Jacobson v. Ormsby (In re Jacobson)*, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. July 26, 2007); *In re Allison*, 960 F.2d at 483; *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995); *Pasagui v. Perez (In re Perez)*, No. 14–32266–H5, 2017 WL 991042, at *7 (Bankr. S.D. Tex. Mar. 13, 2017); *U.S. Merchs. Fin. Grp., Inc. v. Martin (In re Martin)*, No. 15–41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).  Additionally, NDC must prove the amount of its damages.  *See In re Jacobson*, 2007 WL 2141961, at *2, *4 (affirming district court's affirmance of bankruptcy court's determination that "[plaintiff]'s exhibits correctly reflected the amount of damages owed by [debtor].").  The Court now addresses each of the elements that NDC must satisfy.

1.     Knowing and Fraudulent Falsehoods

The Debtor committed knowing and fraudulent falsehoods in her dealings with NDC. When considering whether a knowing and fraudulent falsehood has been made, the subjective mindset of the promisor is the focus.  *Higgins v. Nunnelee (In re Nunnelee)*, 560 B.R. 277, 285 (Bankr. N.D. Miss. 2016).  "A misrepresentation is fraudulent if the maker . . . knows or believes

. . . the matter is not as represented, or does not have the confidence in the accuracy of his representation as stated or implied, or knows . . . he does not have the basis for his representation as stated or implied. *Id.* (internal quotation marks omitted) (quoting *AT&T Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001)). A debtor's silence regarding a material fact can also constitute a false representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017); *Mora v. Abraham (In re Abraham)*, No. 10-03227, 2014 WL 3406513, at *3 (S.D. Tex. July 7, 2014). "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an *overt act* is *not* required." *In re Selenberg*, 856 F.3d at 399 (emphasis in original) (quoting *In re Mercer*, 246 F.3d at 404). A misrepresentation by a debtor of his or her intention to perform contractual duties, for example, may be a false representation under the Code. *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131–32 (Bankr. N.D. Tex. 2005); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (internal citations omitted) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 199 (Tex. Civ. App.—Houston [1st Dist.] 2014, pet. denied) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time the promise was made."). This intent may be inferred from the fact that the debtor failed to take any steps to perform under the agreement. *See In re Hurst*, 337 B.R. at 131; *Nwokedi*, 428 S.W.3d at 199 ("The speaker's intent at the time of the representation may be inferred from the speaker's acts after the representation was made."). One court has notably stated that:

> Intent is a fact question within the realm of the trier of fact because it is dependent upon the credibility of witnesses and the weight to be given their testimony . . . . [B]reach of a promise to perform combined with "slight circumstantial evidence" of fraud constitutes some evidence of fraudulent intent and is legally sufficient to support a verdict.

*Nwokedi*, 428 S.W.3d at 199 (citations omitted).

At trial, the Debtor expressly testified that her intention was "always to honor any agreement" between herself and NDC. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 137:25–138:1]. However, NDC asserts that the Debtor had no intention of performing under the Agreement as promised based upon her misconduct from July 2013 through October 2013. [Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 119:10-20]. This Court agrees with NDC.

### a.    The TOWR Contract

Under the Agreement, the Debtor agreed to equally split profits with NDC for consulting and training services for NDC's members. [Finding of Fact No. 12]. There is no question that ADM is one of NDC's members and that NDC introduced the Debtor to ADM. [Finding of Fact Nos. 19–20]. The record sufficiently shows that the TOWR Contract falls within the scope of the Agreement because the Debtor conducted training services for ADM. [Finding of Fact No. 23]. Yet, the Debtor, after earning and receiving $13,500.00 for performing training services under the TOWR Contract, failed to ensure that NDC received 50% of these proceeds. [Finding of Fact No. 25]. Indeed, the fact the Debtor surreptitiously executed the TOWR Contract with ADM, concealed all of the details with respect to the TOWR Contract, and failed to send a copy of the TOWR Contract to NDC underscores that the Debtor had no intent to perform under the Agreement. [Finding of Fact No. 24]. Thus, this Court finds that the Debtor committed a knowing and fraudulent falsehood with respect to the TOWR Contract.

### b.    The ADM Contract

First, the Debtor had an affirmative duty to disclose material facts to NDC, including the fact that she began performing work under the ADM Contract.  When ADM executed the ADM Contract, there is no question that the Debtor, as a hired consultant by NDC, was to perform these services and ensure that NDC received 50% of the net profits under the Agreement.  [Finding of Fact No. 28].  Yet, the Debtor commenced providing services to ADM without notifying NDC or any of its agents or representatives.  [Finding of Fact No. 30].  Stated differently, the Debtor's silence was deafening.  [*Id.*].  If the Debtor had informed NDC that she was rendering these services to ADM, then NDC could have done its part by sending the requisite invoices to ADM and collecting the payments accordingly, and thereafter distributing the Debtor's 50% share to her pursuant to the Agreement.  Therefore, the Debtor's failure to notify NDC that she had started to perform services for ADM constitutes a fraudulent misrepresentation.

In addition to her silence with respect to the commencement of work, the Debtor also expressly made false representations.  Specifically, the Debtor had already started performing services for the ADM Contract for approximately six weeks without informing NDC of this critical fact.[23]  After that period, DeGroot and Kennedy made attempts to request updates and invoices from the Debtor.  [Finding of Fact Nos. 32–34].  Because the Debtor continued to keep NDC in the dark, Kennedy contacted the Debtor on September 9, 2013, and inquired whether she had started the work.  [Finding of Fact No. 32].  In response to this inquiry, the Debtor replied that she had just started rendering services to ADM on that day.  [*Id.*].  This Court finds that the Debtor knew the representation that she had not started rendering services to ADM was false.  [*Id.*].  This

---

[23] The Statement of Work is dated June 6, 2013.  Kennedy's e-mail (which he sent to the Debtor after first learning about the existence of the ADM Contract) is dated July 23, 2013.  The Court therefore draws the inference concerning the six-week time frame on this issue.

representation was patently untrue because, by this point, the Debtor knew full well that she had already started performing the training and consulting services for ADM.  [Finding of Fact No. 30].  This scenario is a classic example of a blatant falsehood of an existing fact.  *See, e.g.*, *Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 641–42 (Bankr. S.D. Tex. 2018) (finding that the debtors made knowing and fraudulent falsehoods when the debtors represented to the creditor that they had not surreptitiously sold assets to a third party when, in fact, they had done so nearly a month earlier).

Furthermore, the Debtor also failed to inform Kennedy that she had unilaterally changed the procedures for billing ADM by directing ADM to send payments to Diversity on Demand, which was contrary to the Agreement; indeed, the Agreement required that the invoice payments were to be sent directly to NDC.  [Finding of Fact Nos. 23–24, 29].  In fact, on September 9, 2013, the Debtor admitted that she directly sent an invoice to ADM and instructed ADM to remit payments to her instead of NDC.  [Finding of Fact No. 35].  Thereafter, she received $36,837.50 from ADM.  [Finding of Fact Nos. 35, 37(c)].  On this same date, Kennedy immediately advised her to discontinue these billing practices.  [Finding of Fact No. 36].  Kennedy then reiterated the proper protocol for billing (i.e., NDC would receive the payments from ADM), which the Debtor acknowledged was one of the terms of the Agreement and that she understood this term.  [*Id.*].  Despite these unequivocal instructions, the Debtor disregarded Kennedy's directive and continued to request ADM to send payments directly to her.   [Finding of Fact No. 37(c)].  Therefore, the Debtor's conduct constitutes an actionable misrepresentation because her promise to discontinue collecting payments from ADM evidences that she had no intention of performing as promised.  Thus, this is another instance where the Debtor has made a knowing and fraudulent falsehood.

There is more.  On October 17, 2013, Kennedy demanded the Debtor to disgorge all ill-gotten gains.  [Finding of Fact No. 37(d)].  In response, the Debtor requested 50% of the proceeds from the ADM Contract.  [Pl.'s Ex. 20 at 1].  The Court interprets this request to mean that she would retain 50% of her share of the ADM Contract and remit the remaining share to NDC.  The irony of her request, however, is that she maintained complete custody and control of all of the proceeds because she never remitted any monies to NDC.  [Finding of Fact No. 38].  Her refusal to return the proceeds to NDC is what caused NDC to initiate the State Court Lawsuit.  [Finding of Fact No. 44].  Therefore, this Court finds that the Debtor committed yet another knowing and fraudulent falsehood with respect to the ADM Contract because she never intended to perform under the Agreement with respect to any contract that would generate substantial revenues.[24]

For all of the above-referenced reasons, NDC has met its burden of establishing that the Debtor committed knowing and fraudulent falsehoods.

### 2.   The Debtor Described Past or Current Facts

Under § 523(a)(2)(A), the Fifth Circuit has held that a false representation must "encompass statements that falsely purport to depict *current or past facts*."  *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991).  The Fifth Circuit has also noted that misrepresentations concerning a past or "current fact of [the Debtor's] *future intention*" will satisfy this element.  *In re Allison*, 960 F.2d at 484 (emphasis added).  "A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised."  *Metz v. Bentley (In re Bentley)*, 531 B.R. 671, 688 (Bankr. S.D. Tex. 2015) (quoting *In re Allison*, 960 F.2d at 484).

---

[24] As previously noted, the Debtor complied with the terms of the Agreement with respect to the Small Contract, but in the Court's view, this is because the revenues were *de minimis*.

In the suit at bar, the Debtor's representations to NDC described past or current facts.  First, she represented at trial that she always intended to honor the Agreement, but her actions during the period of July 2013 through October 2013 were directly contrary to this representation.  Her representation was—to be charitable—very hollow.

### a.     The TOWR Contract

The Debtor agreed to split profits and send invoices to NDC in accordance with the Agreement.  [Finding of Fact No. 12].  As stated herein, the Debtor's misrepresentation involved current facts of her future intention of nonperformance under the Agreement.  Although the Debtor may have initially intended to perform under the Agreement, and did, in fact perform dutifully one time with respect to the Small Contract after Kennedy introduced her to ADM, [Finding of Fact No. 21], the Debtor's subsequent breach of promise to perform under the Agreement, coupled with her deceitful conduct, establishes fraudulent intent of a current fact as well as a misrepresentation of her future intention to perform under the Agreement.  *Spoljaric*, 708 S.W.2d at 434–35 (internal citations omitted) ("While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made . . . .  Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made . . . .  'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent."); *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1034 (5th Cir. 2010) ("The court should consider all the circumstantial evidence as a whole to determine whether the evidence 'transcend[s] mere suspicion.'") (quoting *IKON Office Sols., Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).

53

Here, the slight circumstantial evidence of fraud by the Debtor's conduct in connection with the TOWR Contract is as follows:  (1) the Debtor furtively executed the TOWR Contract with ADM,[25] [Finding of Fact No. 24]; (2) the Debtor failed to send a copy of the TOWR Contract to NDC or otherwise notify NDC of this business arrangement with its member, [Finding of Fact No. 26]; (3) the Debtor failed to disclose to NDC that she performed services under the TOWR Contract, [*id.*]; (4) the Debtor failed to disclose to NDC that she directly sent an invoice to ADM requesting payment for her services, [Finding of Fact No. 25]; (5) the Debtor failed to disclose to NDC that she received $13,500.00 from ADM, [*id.*]; and (6) the Debtor failed to remit one-half of these proceeds to NDC, [*id.*].  For all of these reasons, the Court finds that the Debtor's representations described current facts and/or promises that she made that she had no intention of keeping when she entered into the Agreement.

### b.    The ADM Contract

The Court highlights three instances to show how NDC has satisfied this element.  First, the Debtor made a false representation of a past or current fact when she told Kennedy that she had not started rendering services to ADM, even though she had in fact already started performing services.  [Finding of Fact No. 35].  Second, the Debtor made another false representation of current fact of her future intention when she told Kennedy that she was going to send her invoices to him, when she, in fact, never intended to send her invoices (especially after numerous requests by Kennedy and DeGroot).  [Finding of Fact Nos. 33–37].  Third, the Debtor made yet another false representation of a current fact of her future intention when she told Kennedy that she would adhere to the proper billing protocol pursuant to the terms of the Agreement but then (1) failed to instruct ADM to send payments to NDC rather than Diversity on Demand; and (2) failed to remit

---

[25] The Court emphasizes that the TOWR Contract contained NDC's logo and name on the signature page.  [Pl.'s Ex. 13].

the payments that she received from ADM to NDC to remedy her noncompliance of the Agreement. [Finding of Fact Nos. 36–38]. In sum, the Debtor had no intention of following the proper billing protocol under the Agreement because she continued to send invoices directly to and receive payments directly from ADM. [Finding of Fact No. 39]. Thus, the Court finds that the Debtor's representations described past or current facts and that these representations were made by the Debtor with no intention of carrying them out when she made them.

Thus, for all of the above-referenced reasons, this Court concludes that NDC has satisfied its burden and finds that the Debtor's representations described past or current facts.

### 3.    National Diversity Council Relied Upon the Debtor's False Representations

In order for this Court to render any portion of the Judgment non-dischargeable for false representations, NDC must prove that it relied on the Debtor's representations. *Field v. Mans*, 516 U.S. 59, 74 (1995); *In re Bandi*, 683 F.3d at 675. Under 11 U.S.C. 523(a)(2)(A), the test is whether NDC justifiably relied—as opposed to reasonably relied—upon the representations made by the Debtor. *Field*, 516 U.S. at 70–71 (citations and quotations omitted) ("Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."). As noted in *Cohen v. Third Coast Bank*, "justifiable reliance does not impose a duty to investigate unless the falsity of the representation is readily apparent or obvious, or there are 'red flags' indicating that reliance is unwarranted." No. 1:13-CV-610, 2014 WL 2729608, at *9 (E.D. Tex. June 16, 2016). A creditor has no duty to investigate a debtor's representation, unless the "falsity of the representation is readily apparent." *Guion v. Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (citing

*Field*, 516 U.S. at 70–72); *see also Wright v. Minardi (In re Minardi)*, 536 B.R. 171, 187–88 (Bankr. E.D. Tex. 2015) ("Justifiable reliance does not require a plaintiff to demonstrate reasonableness nor does it impose a duty to investigate unless the falsity is readily apparent.").  To determine whether a creditor justifiably relies on a misrepresentation, the court must examine the "circumstances of a particular case and the characteristics of a particular plaintiff, [and] not . . . an objective standard."  *In re Sims*, 479 B.R. at 425; *see also In re Minardi*, 536 B.R. at 187 (emphasis in original) (citation omitted) ("Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances.").

In the suit at bar, Kennedy very credibly testified that NDC relied upon the representations made by the Debtor.  First, Kennedy testified that he relied on the Debtor's representations regarding the terms of the Agreement—namely, that she agreed to NDC sending and collecting all invoices and then remitting 50% of the profits to the Debtor.  [Finding of Fact No. 16].  The Debtor's professional experience in the relevant industries coupled with their long-term friendship is the reason Kennedy, on behalf of NDC, entered into the Agreement with the Debtor as a consultant for NDC.  [Finding of Fact Nos. 6–13].  Specifically, Kennedy first testified at trial about the closeness of their relationship as it related to entering into the Agreement:

| | |
|---|---|
| NDC's Counsel: | Was there any written agreement between you and Ms. Carter? |
| Kennedy: | No. |
| NDC's Counsel: | Why not? |
| Kennedy: | Because I trusted her and she had been my friend for over 10 years. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 26:21–27:1]. He then testified about his reliance with respect to the Debtor's violation of the Agreement by her directly sending invoices to ADM and thereafter representing to Kennedy that she was going to send the invoices to NDC (when she had no intention of doing so). This reliance is evidenced by the following testimony:

| NDC's Counsel: | I'd like to look at your response on the bottom of the previous page. You state, Carmen, I'm not sure why you started -- why you decided to start [sending] invoices to ADM. We had been asking you for months on when we can send ADM an invoice. Our agreement was always that we would invoice and distribute the money. I will be reaching out to ADM next week regarding our agreement. For all future invoices please [l]et Jason know. He will have an invoice sent. In addition, we would like all monies to be put into the NDC bank account for distribution. Do you see that? |
| --- | --- |
| Kennedy: | Yes. |
| NDC's Counsel: | The sentence that, We have been asking you for months on when we can send an invoice, that's not something that you made up after the fact. Correct? |
| Kennedy: | No.   I mean we had been [in communication with each other] via e-mail or phone call having conversations. And keep in mind, this is my friend I've known for 10 years. Never in my wildest dreams did I think she would still deceive. And if you read her emails, she talks about her relationship with Christ.   I never thought that that would be Carmen Carter. Never. |

[Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 48:1-20].

Moreover, the Debtor's reputation as a sophisticated and experienced businesswoman was another reason why Kennedy relied upon her representations when he (on behalf of NDC) and the Debtor entered into the Agreement.  [Finding of Fact No. 10].  Indeed, because of her expertise, Kennedy sufficiently trusted the Debtor to give her the moniker of "Chief Talent & Diversity Officer" and authorized her to utilize NDC's name and logo in communications with NDC's members.  [Finding of Fact Nos. 13, 17].

In light of these circumstances, the Court finds that Kennedy actually relied upon the Debtor's false representations and that such reliance was justified.

### 4.    The Debtor's Conduct Caused Damage to National Diversity Council

The Debtor's conduct undeniably caused damage to NDC.  First, the Debtor surreptitiously secured the TOWR Contract and received proceeds of $13,500.00 from ADM without NDC discovering what she had done.  [Finding of Fact Nos. 22–25].  The Debtor never remitted 50% of $13,350.00 to NDC, and therefore NDC was damaged to the tune of $6,750.00.  [Finding of Fact No. 25].

Thereafter, she continued to usurp business opportunities from NDC.  [Finding of Fact No. 28].  Specifically, the Debtor intentionally concealed all of the activity relating to the ADM Contract from June 2013 until July 2013.  [Finding of Fact Nos. 28–31].  Indeed, she intentionally concealed this information—knowing that NDC trusted her—in order to give her time to provide more services to ADM and generate more income for herself to the complete exclusion of NDC.  [Finding of Fact No. 30].  In total, the Debtor was able to generate $147,350.00 for herself as a result of providing services to ADM.  [Finding of Fact No. 42].  The Debtor never remitted 50% of the amount to NDC, and therefore NDC was damaged in the amount of $73,675.00.  Because the Debtor did not remit to NDC its rightful share of proceeds under the Agreement, NDC

experienced cash flow problems and had to lay off several employees, and therefore NDC could not fulfill its mission to expand as it had originally planned.  [Finding of Fact Nos. 40–41].  Thus, the Debtor's conduct also harmed NDC in this non-monetary aspect.

Despite Kennedy's numerous requests to resolve the issue between the parties amicably by persistently requesting the Debtor to turn over the monies earned from the ADM projects, the Debtor refused to comply:  she never sent any money whatsoever to NDC.  [Finding of Fact Nos. 42–43].  Once Kennedy exhausted all options to recover NDC's rightful share of the proceeds without judicial intervention, NDC initiated the proceedings in the State Court Lawsuit.  [Finding of Fact No. 44].  Based upon the jury's answer, the State Court entered the Judgment awarding NDC actual damages ($88,370.00), attorneys' fees ($99,110.00), and interest ($17,421.47), totaling $204,901.47—the principal amount of debt that NDC seeks to except from discharge as a result of the Debtor's false representations.[26]  [Finding of Fact No. 46–47].  Since the date of the entry of  Judgment, the amount that NDC seeks to except from discharge has increased to $212,948.94 due to accrued unpaid costs ($2,405.66) and accrued unpaid interest ($5,641.81) as set forth in NDC's proof of claim.  [Finding of Fact No. 51].

In sum, NDC has met its burden in establishing all of the elements of a claim for false representations.  Therefore, this Court finds that the Judgment is non-dischargeable except for the amount associated with damages that the jury awarded for the Recruiting Services Contract.  Thus,

---

[26] It is important to reiterate that the jury's award of $88,370.00 represents the sum of the damage amounts relating to the three contracts with ADM:  i.e., the TOWR Contract, the ADM Contract, and the Recruiting Services Contract. For the reasons discussed herein, this Court finds that the portion of the Judgment relating to damages for the TOWR Contract and the ADM Contract is non-dischargeable whereas the portion of the Judgment relating to the damages for the Recruiting Services Contract is dischargeable.  [See Section IV.F].  Although the Complaint seeks an order of non-dischargeability for the entire amount of the Judgment, NDC's counsel in open court stated that NDC seeks an order of non-dischargeability for all of the amounts set forth in the Judgment except the $7,945.00 damages associated with the Recruiting Services Contract.

$80,425.00 is non-dischargeable, and $7,945.00 is dischargeable.[27]   The Court now addresses NDC's claim for false pretenses.

## H.   National Diversity Council's Claim Under 11 U.S.C. § 523(a)(2)(A) for False Pretenses

NDC's second claim against the Debtor is based upon § 523(a)(2)(A) for false pretenses. NDC contends that the following conduct of the Debtor constitutes false pretenses:  (1) she concealed her performance under the TOWR Contract, [Finding of Fact No. 24]; (2) she failed to disclose to NDC her intent to engage in self-dealing and solicit ADM, [Finding of Fact Nos. 22–40]; (3) she failed to disclose to NDC her intent to divert from NDC all of the income from the ADM Contract to her own companies (i.e., Inside Diversity, Diversity on Demand, and Diversity on Demand for Leadership), [Finding of Fact Nos. 22–40]; and (4) she failed to remit proceeds to NDC for the TOWR Contract and the ADM Contract, [Finding of Fact Nos. 25, 38; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 122:22–123:1].

To obtain a judgment that a debt is non-dischargeable for false pretenses, the creditor must show:  (1) that the debtor engaged in conduct "wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane[ry] or overreaching;" (2) there was scienter or intent; (3) causation; and (4) damages.  *See Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701–02 (Bankr. S.D.N.Y. 1998).  A claim of false pretenses may be premised on fraudulent conduct without the speaker making express misrepresentations.  *In re Minardi*, 536 B.R. at 187 (quotation omitted) ("While 'false pretenses' and 'false representation' both involve intentional conduct intended to create and foster a false

---

[27] For reasons set forth subsequently herein, the Court also discusses why the attorneys' fees, interest, and court costs awarded in the Judgment are also non-dischargeable obligations.

impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement.").

Bankruptcy courts in other circuits have similarly interpreted the term "false pretenses." *See, e.g.*, *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988) (explaining that a false pretense "involves implied misrepresentation or conduct intended to create and foster a false impression . . . ."); *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990) ("'False Pretense' is more like a con game than a stickup.  It is more like being dealt from the bottom of the deck than being mugged.  A false pretense is generally employed by stealth, implication, and misdirection, while fraud and false representations are typically implemented more by fabrication, explication, and diversion.").  Thus, courts tend to focus on the absence of explicit misrepresentations and the presence of nonverbal conduct that amounts to trickery when analyzing the applicable facts for a claim of false pretenses.  The Court now addresses each of the elements that NDC must satisfy.[28]

---

[28] One court, in distinguishing between a claim for false representation and a claim for false pretenses, has stated the following:

> While most times both conduct and explicit statements by the debtor exist, thereby establishing a fraud under both false pretenses and false representation, the creditor may be able to establish the debtor's conduct without a showing of explicit statements or explicit statements without a showing of the debtor's conduct and still be successful under § 523(a)(2)(A).

*Argento v. Cahill (In re Cahill)*, No. 15-72418-REG, 2017 WL 713565, at *6 (Bankr. E.D.N.Y Feb. 22, 2017).  In the suit at bar, NDC has proven explicit representations made by the Debtor and therefore successfully met its burden on its claim for false representations.  Now, in assessing NDC's claim for false pretenses, this Court finds that NDC has proven sufficient misconduct by the Debtor, but this conduct is intertwined with express representations.  Thus, to the extent that this "false pretenses" section discusses express representations made by the Debtor, not only do they help NDC establish its claim for false pretenses, but they also help NDC further establish its claim for false representations.

1.  <u>The Debtor's Deceitful Conduct Injured NDC's Property Interest:  Namely, its One-Half Interest in the Proceeds Generated from the TOWR Contract and the ADM Contract</u>

       **a.**       **The TOWR Contract**

The Debtor's deceitful conduct from the time she executed the TOWR Contract in May of 2013 until the time she completed the work for ADM in May of 2015 resulted in injury to NDC's property interest.  [Finding of Fact Nos. 22–38].  At some point prior to 2012, the Debtor and Kennedy (on behalf of NDC) entered into the Agreement and hammered out the details for their mutual obligations to avoid any unrealistic expectations.  [Finding of Fact Nos. 12, 14].  Essentially, the parties wanted to combine their respective networks in the corporate and diversity communities to secure business for NDC—an obligation that was mutually beneficial for them because they would split the profits equally.  [Finding of Fact No. 11].

After they entered into the Agreement, the parties performed accordingly until the onset of the TOWR Contract.  [Finding of Fact No. 21–22].  But then, with respect to the TOWR Contract, the Debtor sent a proposal to ADM to perform training and education services in exchange for a discounted fee of $13,500.00.  [Finding of Fact Nos. 22–24].  The Debtor made no disclosures whatsoever to NDC about this proposal.  [Finding of Fact No. 24].  To the extent that the Agreement did not contemplate or otherwise require the Debtor to notify NDC when she made proposals to NDC's members, there is no question that the Debtor had a duty under the Agreement to disclose to NDC the material fact that she executed the TOWR Contract with ADM;[29] indeed, how else could NDC know that it would be sending invoices for the services relating to the TOWR Contract if the Debtor did not inform NDC of this contract?  *Minority Equity Capital Corp. v.*

---

[29] The Court emphasizes that the Debtor executed the TOWR Contract in her capacity as NDC's Chief Talent & Diversity Officer.  Even if she had not done so, however, ADM was nevertheless an NDC member and therefore the Debtor unquestionably should have alerted NDC that she had executed the TOWR Contract, as the Agreement clearly covered this contract and therefore NDC had to set up the invoice structure.  [*See* Finding of Fact No. 14].

*Weinstein (In re Weinstein)*, 31 B.R. 804, 810 (Bankr. E.D.N.Y. 1983) (stating when finding that debtor's conduct amounted to false pretenses, that "[c]ase law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side"). This non-disclosure led NDC to believe the Debtor, although having succeeded in procuring the Small Contract, was still in the process of actively soliciting more business for NDC, and her efforts had not materialized by that time. [Finding of Fact No. 31]. She thereby impliedly represented that she was still acting in good faith on behalf of NDC, which created a false impression that she was actually working for their mutual benefit. *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383–84 (Bankr. N.D. Tex. 2017) (emphasis added) (interpreting "false pretenses" within the meaning of § 523(a)(2)(A) as "written or oral misrepresentations, or *conduct which creates or fosters in the . . . creditor a 'false impression' and can include 'conduct and material omissions*.'").

Instead, without NDC's knowledge, the Debtor was actually pilfering NDC's business and kept the entire $13,500.00 from the TOWR Contract for herself. [Finding of Fact No. 25]. At the time the Debtor received the money, she could have notified NDC about the TOWR Contract and remitted one-half of the proceeds to NDC, but she elected to operate in silence in violation of her duty to speak. *See Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D. Minn. 1995) (noting that false pretenses can also consist of "silence when there is a duty to speak") (quoting *In re Dunston*, 117 B.R. at 641). Indeed, by the Debtor's own admission, she has never paid NDC any money for the services she had furnished for the TOWR Contract. [Finding of Fact No. 25]. Under all of these circumstances, the Court finds that the Debtor engaged in deceitful conduct that damaged NDC's property rights (i.e., deprived it of its 50% share of the proceeds from the TOWR Contract).

### b.     The ADM Contract

The Debtor's deceitful conduct with respect to the ADM Contract also resulted in injury to NDC's property interest.  [Finding of Fact No. 42].  In June of 2013, the Debtor secured another scope of work from ADM.  [Finding of Fact No. 28].  She sent the Statement of Work proposal to ADM and ADM agreed to the terms of the proposal, including the fee of $147,350.00.  [Finding of Fact Nos. 29–30].  When the ADM Contract was executed, the Debtor performed training and consulting services and directly sent an invoice to ADM.  [Finding of Fact Nos. 29–31].  On July 22, 2013—over one month after she procured the ADM Contract—the Debtor eventually notified Kennedy that ADM had approved the proposal and sent a copy of the fully-signed ADM Contract to him.  [Finding of Fact No. 31].  The Debtor withholding from NDC that she had already started performing services and directly invoicing ADM for her work when she had a duty to disclose these facts to NDC demonstrates the Debtor's chicanery.  [Finding of Fact Nos. 30–32]; *see, e.g.*, *Phillips 66 Co. v. Miltenberger (In re Miltenberger)*, 538 B.R. 547, 553 (Bankr. E.D. Mo. 2015) ("[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression.  This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A).") (quoting *Merchs. Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)); *In re Weinstein*, 31 B.R. at 810 ("Case law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side."); *In re Hurst*, 337 B.R. at 133 ("Put simply, if Party 1 is under a mistaken impression as to the truth of a set of facts and Party 2 is aware of the truth and of the mistaken impression, Party 2 is under a duty to correct that mistake prior to the consummation of the transaction.").  By withholding this information, the Debtor led Kennedy to believe that ADM's representatives were

still contemplating the transaction with the Debtor. [Finding of Fact No. 31]. This dishonest scheme paved the way for the Debtor to directly invoice ADM, collect the proceeds due from the invoices, and then keep for herself the entire contract price—i.e., $147,350.00—without equally sharing the proceeds with NDC as required by the Agreement. [Finding of Fact No. 42].

Kennedy discovered that the Debtor had misled him when he received a call from ADM's representative who told Kennedy that the debtor had already started doing work. [Finding of Fact No. 32]. This telephone call caused Kennedy to become suspicious of the Debtor's conduct. [*Id.*]. On September 16, 2013, Kennedy reprimanded the Debtor for directly and surreptitiously sending invoices to ADM and receiving payments from ADM. [Finding of Fact No. 36]. He reiterated the terms of the Agreement and instructed her to refrain from invoicing and collecting payments from ADM and requested her to send to him all proceeds that she had collected from ADM. [*Id.*]. She provided him with assurances that she would comply with these instructions. [*Id.*]. However, the Debtor thereafter defied these instructions, ignored his request, and continued directly sending invoices to and directly receiving payments from ADM. [Finding of Fact No. 37].

Eventually, on October 17, 2013, Kennedy realized that the Debtor had not complied with his numerous requests for invoices, and he therefore sent yet another e-mail requesting the details of what services she had invoiced ADM. [Finding of Fact No. 37(a)]. On the same date, the Debtor told Kennedy that she had already received $36,837.50 for the first invoice and was awaiting receipt of $25,500.00 for the second invoice. [Finding of Fact Nos. 37(b)–(c)]. After determining that the Debtor was not going to remit invoices or the proceeds to NDC and after expressing his dissatisfaction with the Debtor's deceitful conduct, Kennedy terminated NDC's relationship with the Debtor. [Finding of Fact No. 38]. Despite the terminated relationship and without NDC's knowledge or consent, the Debtor collected an additional $85,012.50 from ADM,

thereby bringing the total that she received from ADM under the ADM Contract to the amount of $147,350.00. [*Id.*]. In sum, the Debtor obtained $147,350.00 by false pretenses because she worked on this project without initially notifying NDC of when she actually started providing services to ADM; then she directly invoiced ADM and collected the amounts owed from ADM; and thereafter she withheld all of the invoices and proceeds from NDC. [Finding of Fact Nos. 28–38]. Therefore, the Debtor injured NDC's property rights to its one-half share of the $147,350.00 from the ADM Contract because she engaged in the above-referenced dishonest tactics, offered assurances that she would comply, and yet deprived NDC of its 50% share of these proceeds. [Finding of Fact Nos. 28–38].

Under the circumstances described above, this Court finds that NDC has met its burden in proving the existence of the first element of false pretenses.

### 2. The Debtor Had Scienter or Intent to Deceive

"When deciding whether a creditor has satisfied the 'intent' prong of a 'false pretenses' dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor." *In re Hurst*, 337 B.R. at 133; *see also In re Dunston*, 117 B.R. at 641. Here, the Debtor's sophistication, education, and long-term experience in the diversity and inclusion business underscore that she was fully aware of her wrongful intentions. [Finding of Fact Nos. 8–10]. Moreover, the Debtor's full-time occupation as a professor teaching, among other things, employment law and business communication also underscores that she was fully aware of her wrongful intentions in her dealings with NDC. [Finding of Fact No. 7]. She knew exactly what she was doing when she led NDC to believe that both parties were going to mutually

benefit from the business procured from NDC's partners, when, in actuality, her plan all along was to steal business from NDC and keep all of the proceeds. [Finding of Fact No. 42].

For instance, the Debtor presented herself as a trustworthy businesswoman when she first procured the Small Contract. [Finding of Fact No. 21].  She immediately notified NDC of this business opportunity and kept Kennedy apprised along the way.  [*Id.*].  After she performed and ADM paid NDC, Kennedy paid her one-half of the proceeds pursuant to the Agreement.  [*Id.*].  These circumstances demonstrate that the Debtor knew the terms of the Agreement because she performed in accordance to such terms.  Despite her adherence to the proper protocol between the parties with respect to the Small Contract, the Debtor's subsequent actions, viewed in the aggregate, constitute deceptive conduct, which indicates her intent to deceive NDC and not comply with the terms of the Agreement.

The following actions taken by the Debtor after she complied with the Agreement regarding the Small Contract unquestionably indicate an intent to deceive NDC:  (1) procuring and executing the TOWR Contract without notifying NDC, [Finding of Fact No. 24]; (2) performing under the TOWR Contract without notifying NDC, [Finding of Fact Nos. 24–25]; (3) directly invoicing ADM and receiving payment under the TOWR Contract without notifying NDC, [Finding of Fact No. 25]; (4) failing to equally split the proceeds from the TOWR Contract with NDC, [*id.*]; (5) procuring and executing the ADM Contract without notifying NDC until after she had begun performing, [Finding of Fact Nos. 28–30]; (6) performing the work under the ADM Contract without notifying NDC, [Finding of Fact No. 30]; (7) directly invoicing ADM and receiving payments under the ADM Contract without notifying NDC, [Finding of Fact No. 31]; (8) sending the executed ADM Contract to NDC without notifying Kennedy that she had started performing, invoicing, and collecting monies from ADM, [*id.*]; (9) failing to provide ADM with

the appropriate directive to send payments to NDC, [Finding of Fact No. 29]; (10) providing assurances to Kennedy that she would send invoices to him after he discovered that she had been working and collecting payments all along, [Finding of Fact Nos. 32, 34]; and (11) failing to send any of the invoices or the proceeds collected from ADM despite these assurances, [Finding of Fact Nos. 34, 37–38].

Under all of these circumstances described above, this Court finds that NDC has met its burden of proving that the Debtor intentionally deceived NDC in an effort to usurp business opportunities belonging to NDC for her own personal gain.

3.   The Debtor's Actions Caused NDC to Lose Its Property Interest

Unlike NDC's false representation claim, NDC does not bear a burden to demonstrate it justifiably relied on the express representations made by the Debtor in order to prevail on its false pretenses claim.  According to one court:

> With respect to [justifiable reliance], it is not meaningful to examine into the "justifiable reliance" of a creditor in the case of fraudulent or deceitful conduct involving non-disclosure or concealment.  But "reliance" in classic fraud is, in reality, nothing more nor less than the element of causation, since it is the creditor's reliance which provides the causal link between the debtor's false representation and the creditor's damage.  Thus, in a case involving false pretenses or fraud based upon the debtor's non-disclosure or concealment, classic reliance cannot and need not be proved, but the creditor must nevertheless establish a causal link between the debtor's misconduct and the creditor's injury.

*In re Luppino*, 221 B.R. at 701; *see also In re Bentley*, 531 B.R. at 688 ("Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts.") (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).  Here, the Court finds that the Debtor's fraudulent or deceitful conduct involving non-disclosure or concealment caused NDC to lose its rightful share to one-half of the proceeds earned from the TOWR Contract and the ADM Contract.

68

First, the Debtor completely concealed all details pertaining to the TOWR Contract, including its execution thereof as well as the subsequent collection and retention of the entire invoice amount. [Finding of Fact Nos. 24–25]. The Debtor never disclosed to NDC any of her involvement with ADM regarding this particular contract. [Finding of Fact No. 24]. She surreptitiously stole this opportunity from NDC and kept all of the proceeds for herself. [*Id.*]. Given these circumstances, the Court finds that the Debtor's misconduct directly caused NDC to lose its property interest (i.e., 50% of the profits) in the TOWR Contract.

In addition to causing NDC to lose its property interest in the TOWR Contract, the Debtor also failed to disclose pertinent information to NDC with respect to the ADM Contract. After the Debtor started performing services for ADM under the ADM Contract, the Debtor initially concealed the material fact that she had already began performing under this contract, directly sending invoices to ADM, and directly collecting payments from ADM. [Finding of Fact Nos. 30–31]. Rather than immediately notifying NDC that she had started performing services under the ADM Contract like she did with the Small Contract, [Finding of Fact No. 21], she waited over one month to send the executed contract to Kennedy to review and notify him of the arrangement, [Finding of Fact No. 31]. Kennedy only discovered that the Debtor had begun rendering services through an ADM representative, and not from the Debtor's own forthrightness, which prompted Kennedy to investigate further. [Finding of Fact No. 32]. When he communicated with the Debtor, she told him that she would send the invoices to him and discontinue requesting payments from ADM. [Finding of Fact No. 36]. Kennedy, on behalf of NDC, was not required to assume that the Debtor was "lying or misrepresenting" these facts—i.e., that she was lying when she said that she would send the invoices and stop requesting ADM to send payments to her. *W. Builders of Amarillo, Inc. v. Morrison (In re Morrison)*, 361 B.R. 107, 123 (Bankr. W.D. Tex. 2007),

*aff'd*, 555 F.3d 473 (5th Cir. 2009); *Heritage Bank v. McCracken (In re McCracken)*, 586 B.R. 247, 257 (Bankr. S.D. Tex. 2018) ("A creditor is not required to assume that a debtor is lying or misrepresenting facts in its written statements.") (internal quotation and citation omitted).

Contrary to what she promised Kennedy that she would do—namely, send invoices to him—she had absolutely no intention of doing so.  [Finding of Fact No. 35].  Meanwhile, the Debtor continued working and collecting payments from ADM until Kennedy terminated NDC's relationship with her.  [Finding of Fact Nos. 37(c)–(d)].  She did not send any money to NDC even though she told Kennedy that she would retain one-half of the proceeds under the terms of the "50/50 agreement" and remit the remainder to NDC.  [Pl.'s Ex. 20 at 1].  Had Kennedy known that the Debtor was going to keep all of the money from NDC, he would have immediately replaced the Debtor and hired another consultant to perform services for ADM.  [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:11-21].  Thus, the Debtor's misconduct—first, surreptitiously performing services; second, directly invoicing and collecting payments; and third, promising Kennedy that she would send him the invoices and proceeds when she had no intention of doing so—caused damage to NDC's property interest (i.e., its inability to collect its 50% of profits from the ADM Contract).  Moreover, but for the Debtor withholding the funds pursuant to the Agreement, NDC would not have suffered a cash flow crunch that caused it to lay off several employees.  [Finding of Fact No. 40].  Stated differently, NDC would not have had to lay off its employees had the Debtor adhered to the Agreement because the ADM Contract was its largest project and it would have brought NDC out of its financially distressed condition.  [Finding of Fact Nos. 29, 40–41].  Therefore, it is clear to this Court that the Debtor's misconduct caused NDC to lose its property interest in the ADM Contract—causing NDC to lose out not only of its 50% share of the proceeds

from the ADM Contract (i.e., $73,675.00) but also lose several employees who had to be laid off due to insufficient cash flow to pay their salaries.   [Finding of Fact Nos. 29, 40–41].

### 4.   The Debtor's Conduct Caused Damage to NDC

As already described herein, the Debtor's conduct unquestionably caused damage to NDC. With respect to the TOWR Contract and the ADM Contract, the Debtor deprived NDC of the money that the Debtor had agreed under the terms of the Agreement to equally share with NDC. [Finding of Fact No. 39].   Specifically, by collecting and keeping all of the proceeds from the TOWR Contract and the ADM Contract (which totaled $13,500.00 and $147,350.00, respectively), the Debtor caused NDC to suffer damages totaling $6,750.00 and $73,675.00, respectively, for a total damage figure of $80,425.00.   Moreover, the Debtor's misconduct also caused NDC to lay off its contract employees because NDC relied on this source of funds to maintain and expand its operations.   [Finding of Fact Nos. 40–41].   But for the Debtor surreptitiously obtaining all of the money from the TOWR Contract and the ADM Contract through false pretenses, NDC would not have allowed the Debtor to pursue additional contracts with ADM or any other of its members. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:11-21].   Indeed, NDC would have hired another competent consultant to perform the same services that the Debtor had promised to offer under the Agreement.   [*Id.*].   Thus, there is no question that NDC would have suffered no harm if the Debtor had been forthright in her intentions to furtively divert business revenues from NDC.

Under these circumstances, the Court finds that this element is satisfied.   And, because NDC has proven all of the elements under its claim for false pretenses, the Court finds that the amount of $80,425.00 (out of the Judgment amount of $88,370.00) is non-dischargeable under § 523(a)(2)(A).

**I.     National Diversity Council's Claim Under 11 U.S.C. § 523(a)(2)(A) for Actual Fraud Under the *Selenberg* Approach**

NDC's third claim against the Debtor is based upon § 523(a)(2)(A) for actual fraud.  The Fifth Circuit has set out the well-defined elements of actual fraud.  *See Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).  Specifically, the Fifth Circuit has stated that a creditor must prove actual fraud by a preponderance of the evidence by showing that:  (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations (the "*Selenberg* Approach").  *Id.* (quoting *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 787 F.3d 312, 319 (5th Cir. 2015)).  In the recent opinion of *Husky International Electronics, Inc. v. Ritz*, the Supreme Court held that no actual representation is required because the "term 'actual fraud' . . . encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."  136 S. Ct. 1581, 1586 (2016).

It is important to note that the Supreme Court did not establish new elements for establishing a § 523(a)(2)(A) claim for actual fraud; rather, it simply expanded the definition of actual fraud.  *Id.*  The Supreme Court interpreted the individual meanings of "actual" and "fraud" and explained its reasoning for expanding the definition of "actual fraud":

> "Actual fraud" has two parts:  actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that involves moral turpitude or intentional wrong.  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that may exist without the imputation of bad faith or immorality.  Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* (internal citations and quotations omitted).  Although the Supreme Court did not precisely define "actual fraud," it did note that fraud in general "connotes deception or trickery."

*Id.*  A review of the evidence in the suit at bar leads this Court to find that NDC has satisfied the five elements required to prove actual fraud under the *Selenberg* Approach.  The Court now addresses these five elements.

1.      The Debtor Made Representations

With respect to the first element, the Debtor made the following representations:  (1) that she would equally split the net profits for training and consulting services for work that the Debtor performed for NDC's members, [Finding of Fact No. 12]; (2) that she would send her invoices to NDC so that NDC could then send invoices to its members and instruct these members to remit payment directly to NDC, [Finding of Fact No. 14]; (3) that she would not receive payments directly from NDC's members, [*id.*]; (4) that she would send the invoices to Kennedy once she commenced rendering training and consulting services, [Finding of Fact No. 34]; (5) that she would provide Kennedy and DeGroot with information pertaining to the proceeds that she herself collected from the ADM Contract through her direct invoicing, [Finding of Fact No. 35]; (6) that she would not permanently retain 100% of the profits from the consulting or training work performed, [*id.*]; and (5) that she would refrain from requesting and receiving payments from NDC's members once Kennedy confronted the Debtor about her misconduct, [*id.*].  Thus, NDC has met its burden of proving that the Debtor made representations to NDC.

2.      The Debtor Knew the Representations Were False at the Time the Representations Were Made

NDC has also met its burden in proving that the Debtor knew that the representations were false at the time that she made the representations.

The Debtor knew that her representations relating to equally sharing the profits for training and consulting services for work performed on behalf of ADM were false.  [Finding of Fact No. 12].  After equally sharing the profits from the Small Contract—which this Court finds that she

did to lure NDC into believing that she was trustworthy and would abide by the terms of the Agreement with respect to contracts that generated substantial revenues[30]—the Debtor never split the profits that she earned for the training and consulting services thereafter.  [Finding of Fact No. 22].  Indeed, the Debtor conducted negotiations with ADM regarding the TOWR Contract, and she disclosed none of these negotiations to NDC.  [Finding of Fact No. 24].  Next, the Debtor executed the TOWR Contract without disclosing the terms with NDC, or sending a copy of this contract to NDC.  [*Id.*].  Additionally, the Debtor performed under the TOWR Contract without notifying NDC whatsoever.  [Finding of Fact No. 25].  Finally, the Debtor directly invoiced and collected $13,500.00 from ADM for services that she provided pursuant to the TOWR Contract.  [*Id.*].  Although the Debtor knew that under the terms of the Agreement, NDC was supposed to invoice its members, including ADM, the Debtor instead directly sent invoices to ADM and explicitly instructed ADM to make checks payable to her company (i.e., Diversity on Demand).  [Finding of Fact Nos. 23–24].  Moreover, after collecting this money, the Debtor did not send NDC its one-half share pursuant to the Agreement.  [Finding of Fact No. 25].  These actions show that she knew all along that her representations under the Agreement—namely, that she would let NDC do the invoicing and she would be entitled to only 50% of the proceeds—were false.

With respect to the ADM Contract, the Debtor's actions also unequivocally show that the Debtor knew that her representations to split the proceeds equally with NDC were false.  After the Debtor started performing services for ADM under the ADM Contract, she failed to send any information to NDC about this new deal.  Kennedy requested her to send the invoices to him, [Finding of Fact Nos. 32–36], and she assured him that she was going to send these invoices to

---

[30] The Court emphasizes that the Small Contract generated *de minimis* proceeds—i.e., $1,250.00—so the Debtor had virtually nothing to gain by keeping all of these proceeds and everything to gain by giving the appearance to NDC that she was honest and was committed to fulfilling the terms of the Agreement.

him.  This representation was patently false at the time she made it because she never intended to send him any information, as she did not want Kennedy to foreclose any opportunity that she had to keep 100% of all of the proceeds.  In fact, the record supports this conclusion because she also represented to him that she started rendering services under the ADM Contract on September 9, 2013, when, in fact, she had already begun rendering services much earlier.  [Finding of Fact No. 35].  The Debtor also represented that she was going to send one-half of the proceeds to Kennedy based on the Agreement, but she knew that this representation was false because she wanted to keep the entire amount of proceeds for herself—which she in fact accomplished by retaining the entire $147,350.00 paid by ADM.  [Finding of Fact No. 42].  Thus, the Debtor's actions show that she knew all along that her representations regarding the information, invoices, and the proceeds were false.  NDC has met its burden in satisfying this element.

3.    The Debtor Made False Representations with the Intention and Purpose to Deceive National Diversity Council

With respect to the third element, the Debtor made the above-referenced representations with the intention and purpose to deceive NDC.  In fact, the Debtor's actions underscore her intention of retaining 100% of the proceeds because she continued to make more false representations in an effort to surreptitiously siphon off more business opportunities and withhold NDC's 50% share of the proceeds from these business opportunities.  [Finding of Fact Nos. 34, 36].  Stated differently, the Debtor made additional misrepresentations after she executed the ADM Contract because she knew that such misrepresentations would help her accomplish her ultimate goal of stealing more money from NDC.  [Finding of Fact Nos. 34, 36].  Although the Debtor disclosed that she had already conducted negotiations with respect to the ADM Contract and sent a copy of the executed copy to Kennedy, the Debtor concealed relevant information from NDC so that she could continue carrying out her scheme to keep all of the proceeds paid by ADM.  [Finding

of Fact No. 31].  Indeed, the Debtor concealed that she had started performing consulting and training services under the ADM Contract.  [Finding of Fact No. 30].  Kennedy requested that she send invoices to him to examine and review the actual work that she had performed.  [Finding of Fact Nos. 32–36].  The Debtor had no intention of sending invoices to Kennedy—despite telling him that she was going to send the invoices—because that would have obstructed her ultimate scheme to deprive NDC of its one-half share of this very lucrative contract.  [Finding of Fact Nos. 34–39].

Kennedy continued to follow up with the Debtor, and even requested DeGroot to obtain further details about the ADM Contract from the Debtor, but she failed to provide them with such information, despite making assurances that she would.  [Finding of Fact Nos. 33–35].  Even after Kennedy spoke with the Debtor about her lack of communication and failure to send information to him, the Debtor, in order to keep Kennedy at bay while she fully accomplished her scheme, continued to make promises that she would not receive payments from NDC's members and would ultimately comply with the Agreement.  [Finding of Fact No. 36].  Moreover, the Debtor promised Kennedy that she would send NDC one-half of the proceeds that she had received from the ADM Contract, even though she knew from the beginning of her scheme that she was not going to fulfill this promise.  [Pl.'s Ex. 20 at 1].  Indeed, despite these assurances, the Debtor failed to keep her promises, and Kennedy thereafter terminated NDC's relationship with the Debtor.  [Finding of Fact No. 38].  The Debtor did not protest the termination or otherwise try to salvage the business relationship because she knew that she could continue to usurp more lucrative deals from ADM without any interference from NDC.  [*Id.*].  The Debtor accomplished her goal.  [Finding of Fact No. 39].  Indeed, she executed the Recruiting Services Contract with ADM, provided recruiting

services to ADM, and received $15,890.00.[31]   [*Id.*].   For all of these reasons, NDC has satisfied this third element.

        4.    <u>National Diversity Council Relied on the Debtor's False Representations</u>

With respect to the fourth element, NDC relied on the above-referenced representations made by the Debtor.   At trial, Kennedy very credibly testified about the terms of the Agreement as well as the Debtor's actions that materially violated the Agreement.   [Finding of Fact No. 16]. Indeed, Kennedy explained that he entered into the Agreement with the Debtor because not only did he trust her due to a longstanding friendship with her, but also because she was very knowledgeable in the diversity sector and that this opportunity would be mutually beneficial for both parties.   [Finding of Fact Nos. 6–11].   Kennedy relied upon the Debtor's representation pursuant to the Agreement that she would use her expertise to solicit business from NDC's members for the benefit of NDC.   [Finding of Fact No. 20].   Kennedy very credibly testified that he relied on the Debtor's promises under the Agreement relating to performing the work, allowing NDC to invoice its members, and receiving payments from NDC.   [Finding of Fact No. 16].   He also subsequently relied upon the Debtor's assurances that she was going to send the invoices to him after he asked her to do so (having discovered from ADM that she was directly sending her own invoices).   [Finding of Fact No. 34].   As a result of Kennedy's reliance, on behalf of NDC, NDC not only lost revenues, but thereafter had to lay off its contract employees because it could not meet payroll due to lack of cash flow.   [Finding of Fact No. 40].   Therefore, there is sufficient evidence in the suit at bar to prove that NDC justifiably relied on the Debtors' representations. *Field*, 516 U.S. at 73–74 ("Following our established practice of finding Congress's meaning in

---

[31] As this Court has already noted, the $7,945.00 that the jury in the State Court Lawsuit awarded to NDC because of the Debtor's failure to remit 50% of the $15,890.00 that the Debtor received from the Recruiting Services Contract is a dischargeable debt because she entered into this contract after NDC had terminated the Agreement and she was not bound by any covenant not to compete. *See supra* note 20.

the generally shared common law when common-law terms are used without further specification, we hold that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance.").

     5.    <u>The Debtor's Representations and Conduct Caused Damage to National Diversity Council</u>

The final element NDC must prove under the *Selenberg* Approach is that NDC sustained a loss as a proximate result of the Debtors' false representations. *In re Selenberg*, 856 F.3d at 398. NDC must show that the two types of causation are met: (1) the Debtor's misrepresentations were the actual or "but for" cause of NDC's harm; and (2) the Debtor's misrepresentations were the proximate cause of the injury—i.e., they foreseeably could have produced the injury NDC suffered. *First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)*, 555 B.R. 771, 782–83 (Bankr. D. Kan. 2016); *see also Gomez v. Saenz (In re Saenz)*, 534 B.R. 279, 299 (Bankr. S.D. Tex. 2015) (holding that foreseeable injury resulting from a debtor's misrepresentation was non-dischargeable actual fraud under § 523(a)(2)(A)); *S. Title Ins. Corp. v. Mohiuddin (In re Mohiuddin)*, Adv. No. 16–3151, 2017 WL 2123870, at *11 (Bankr. S.D. Tex. May 16, 2017) (same).

In this suit, it is clear that NDC has established actual cause. Actual cause—or "but for" causation—"means that [the debtor's] misrepresentations must have played a substantial part, and so were a substantial factor, in affecting [the creditor's] course of conduct that result[ed] in his loss." *In re O'Brien*, 555 B.R. at 782 (internal citations and quotations omitted). Here, the Debtor made representations when entering into the Agreement by telling Kennedy that she was agreeable to sending her invoices to NDC, letting NDC send invoices to its members and collecting the sums owed, and letting NDC distribute 50% of the profits to her. Kennedy relied upon these representations into entering into the Agreement on behalf of NDC. [Finding of Fact No. 16]. Thereafter, the Debtor violated the Agreement and deprived NDC of the money that the Debtor agreed to equally share with NDC with respect to the TOWR Contract and the ADM Contract.

[Finding of Fact No. 42]. The Debtor was acutely aware that NDC had been operating at a loss since 2012 because Kennedy had told her that NDC could not afford to pay her a salary. [Finding of Fact No. 41]. In 2013, Kennedy was only aware of one contract—the ADM Contract—because the Debtor completely concealed her dealings regarding the TOWR Contract. [Finding of Fact No. 24]. Eventually, after communicating with an employee of ADM, Kennedy became aware of the most lucrative contract—the ADM Contract. [Finding of Fact No. 33]. If the Debtor would have performed under the Agreement and at least equally split the proceeds from the ADM Contract, NDC would have been able to fulfill its mission to increase its scope of participation in other states and improve its overall financial condition. [Finding of Fact No. 41]. Stated differently, NDC would not have experienced a fiscal loss in 2013 if the Debtor would have remitted one-half of the proceeds to NDC pursuant to the Agreement. [*Id.*]. But for the Debtor siphoning all of the money from the TOWR Contract and the ADM Contract through actual fraud, NDC would not have allowed the Debtor to pursue additional contracts with ADM or any other of its members. [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 38:11-21]. Indeed, NDC would have hired another competent consultant to perform the same services that the Debtor agreed to offer. [*Id.*]. Therefore, the first type of causation is met because the Debtor's misrepresentations were a substantial factor in affecting NDC's decision-making process to enter into the Agreement in the first instance and then later trust that the Debtor would remit to NDC 50% of the proceeds that she had collected (rather than terminating the relationship immediately).

Similarly, NDC has also established proximate cause. Proximate cause—or legal causation—is largely a question of foreseeability. *In re O'Brien*, 555 B.R. at 782. Stated differently, a fraudulent representation is the proximate cause of a loss if, but only if, the loss might reasonably be expected to result from the reliance. *Id.* at 782–83; *In re Mohiuddin*, 2017 WL

2123870, at *11 ("Reliance is a proximate cause of a plaintiff's loss if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance.").  Here, it was foreseeable that NDC, by relying upon the Debtor's representations, would be damaged if the Debtor violated the Agreement.  After all, she was the one providing the services to ADM, so she was the one who was communicating with and providing services to this member, and NDC trusted her to comply with the Agreement.  The Debtor deprived NDC of the money that the Debtor agreed, pursuant to the Agreement, to equally share with NDC arising from the TOWR Contract and the ADM Contract.  [Finding of Fact No. 39].  Moreover, the Debtor's misconduct also caused NDC to lay off its contract employees because NDC relied on this source of funds to maintain and expand its operations and the Debtor knew full well of the precarious financial position that NDC was in, Kennedy had informed her that NDC has insufficient cash flow to pay her a salary. [Finding of Fact No. 41].  Therefore, it was foreseeable that her stealing NDC's 50% share of the proceeds would cause NDC to lay off employees and also undermine NDC's future objectives of expanding its mission.  [Finding of Fact Nos. 40–41].  Thus, the second type of causation is met because it was foreseeable that NDC would suffer harm if the Debtor violated the terms of the Agreement.

In sum, NDC has met its burden in establishing all of the elements of its claim for actual fraud based on the *Selenberg* approach.  Accordingly, the Court finds that the amount of $80,425.00 (out of the total Judgment amount of $88,370.00) is non-dischargeable under NDC's actual fraud claim based upon § 523(a)(2).

## J.     National Diversity Council's Claim Under 11 U.S.C. § 523(a)(6) for Willful and Malicious Injury

Even if this Court is incorrect about NDC's claims brought pursuant to § 523(a)(2)(A), for false representation, false pretenses, or actual fraud, this Court finds that NDC can prevail under its § 523(a)(6) claim.

The Supreme Court has established guidelines for determining whether a debt arises from "willful and malicious injury" under § 523(a)(6).  *See Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998).  In *Kawaauhau*, the Court held that § 523(a)(6) does not except from discharge debts arising from negligently inflicted injury.  *Id.*  Rather, it applies only to "acts done with the actual intent to cause injury," and excludes intentional acts that merely happen to cause injury.  *Id.* at 61. "Willful," as used in the provision, "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."  *Id.* (emphasis in original).  The Supreme Court also noted that the language of § 523(a)(6) mirrors the definition of an intentional tort, which requires that an actor "intend '*the consequences of an act,' not simply 'the act itself.'*"  *Id.* at 61–62 (emphasis in original) (citing Restatement (Second) of Torts § 8A, Comment *a* (1964)).  Further, as to the "malicious injury" requirement of § 523(a)(6), the Fifth Circuit has held that the word "malicious" creates an "implied malice standard."  *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 605 (5th Cir. 1998).  A debtor acts with implied malice when he acts "with the actual intent to cause injury."  *Id.* at 606.  The test for willful and malicious injury under § 523(a)(6), therefore, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor.  *Id.*; *see also Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 508–09 (5th Cir. 2003).

Injuries covered under this section "are not confined to physical damage or destruction; an injury to intangible personal property or property rights is sufficient."  *Collier on Bankruptcy* ¶ 523.12[4] (16th ed. 2018).  "Thus, the conversion of another's property [or interest in property] without the owner's knowledge or consent, done intentionally and without justification and excuse, is a willful and malicious injury within the meaning of the exception."  *Id.*; *see also Gamble-*

*Ledbetter v. Andra Grp., L.P. (In re Gamble-Ledbetter)*, 419 B.R. 682, 699 (Bankr. E.D. Tex. 2009) ("Willful conversion of another's property falls within section 523(a)(6).") (quoting *Int'l Beauty Prods., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, at *11 (Bankr. N.D. Tex. 2009)). Additionally, an unlawful appropriation of another's funds under the Texas Theft Liability Act ("<u>TTLA</u>") can also qualify as a willful and malicious injury under § 523(a)(6). *See Drexel Highlander Ltd. P'ship, DGP, LLC v. Edelman (In re Edelman)*, No. 13-31182-BJH, 2014 WL 1796217, at *31–32 (Bankr. N.D. Tex. May 6, 2014), *aff'd Edelman v. Drexel Highlander Ltd. P'ship, DGP, LLC*, 3:14-CV-4109-P, 2015 WL 5714728, (N.D. Tex. Sept. 28, 2015). The TTLA provides a civil cause of action to victims of theft, as defined by the Texas Penal Code. *Id.* at *31. Under the Texas Penal Code, "[a] person commits an offense if [1] he unlawfully appropriates property [2] with intent to deprive the owner of property." Tex. Pen. Code § 31.03(a). The Texas Penal Code defines "appropriate" as (1) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or (2) to acquire or otherwise exercise control over property other than real property. Tex. Pen. Code § 31.01(4). Appropriation is unlawful if it is without the owner's effective consent. Tex. Pen. Code § 31.03(b)(1)-(2).

Here, the Debtor unlawfully appropriated NDC's property interest in the proceeds from the TOWR Contract and the ADM Contract when she directly sent invoices to ADM and instructed ADM to make checks payable to Diversity on Demand—a company solely owned by the Debtor— instead of to NDC, and then as a result of the invoices the Debtor sent, ADM remitted funds directly to the Debtor. The Debtor took these actions despite the fact that under the terms of the Agreement, the Debtor was not authorized to receive money directly from ADM whatsoever. [Finding of Fact No. 14]. In fact, the Agreement required that NDC send out all invoices, and that

all checks were to be made payable to NDC, with NDC to remit to the Debtor her 50% share once NDC received payment on the invoice.  [*Id.*].  The Debtor took these actions with the intent to permanently deprive NDC of its 50% share that was due to it under the Agreement under the TOWR Contract and the ADM Contract (i.e., $80,425.00).

The circumstances further reflect that the Debtor's appropriation of NDC's property interest in the proceeds from the TOWR Contract and the ADM Contract was willful and malicious under either the "objective substantial certainty of harm" standard or the "subjective motive to cause harm" standard.[32]

### 1.   Objective Substantial Certainty of Harm

First, the facts and circumstances surrounding the unlawful appropriation of NDC's funds itself indicate that there was an objective substantial certainty that harm would result from the Debtor's calculated actions to conceal her involvement with respect to the TOWR Contract and the ADM Contract.  Indeed, although the Debtor notified Kennedy that she executed the ADM Contract on behalf of NDC—after completely concealing her misconduct relating to the TOWR Contract (including invoicing and collecting all proceeds)—her subsequent actions were disingenuous and diversionary.  [Finding of Fact Nos. 31–38].  She led Kennedy to believe that she was going to send him the information for the services that she rendered as well as the proceeds that she had collected.  [Finding of Fact Nos. 31–38].  At the very moment that the Debtor refused to turn over the proceeds from the TOWR Contract and the ADM Contract, she intentionally injured NDC's property (i.e., its one-half interest in the these proceeds) because she knew—or

---

[32] This Court notes that the Debtor, by violating the terms of the Agreement, committed a breach of contract.  The fact that NDC has a breach of contract claim, however, does not mean that NDC is barred from recovering under a tort claim.  *Texas v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998) ("In addition, under Texas law, a claim for breach of contract and the tort of conversion may arise from the same set of facts."); *Vickery v. Tex. Carpet Co.*, 792 S.W.2d 759, 762 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (finding that plaintiffs proved their case of breach of contract and conversion, which claims arose from the same set of facts)

objectively should have known—that (1) she was not entitled to collect the money from any of NDC's members in the first place, [Finding of Fact No. 14]; and (2) by collecting the proceeds in violation of the Agreement, she was required to deposit these monies into NDC's bank account for NDC to process the distribution, [Finding of Fact No. 37(d)]. Her actions alone constitute not only a breach of contract—as the jury in the State Court Lawsuit has already necessarily decided—but also constitute acts of conversion and theft that are willful and malicious.

The Debtor's acts are willful because the Debtor knew that she was not supposed to collect sums due from NDC's members, and there is no question that ADM was one of NDC's members. [Finding of Fact Nos. 14, 19]. The record supports this conclusion because the Debtor properly carried out her duties under the Agreement with the Small Contract by performing the consulting and training services, sending an invoice to NDC, and receiving an equal distribution of the net profits directly from NDC after NDC collected the money from ADM pursuant to the Agreement. [Finding of Fact No. 22]. The record also supports a finding of the Debtor's knowledge that her misconduct would cause injury to NDC's property rights because she was aware of two key facts: (1) that the state of NDC's financial condition was fragile; and (2) that the payment of NDC's share of the proceeds would have improved the financial condition of NDC for that fiscal year, at least to the point where NDC would not have had to lay off any employees. [Finding of Fact No. 41]; *Herman v. White (In re White)*, 519 B.R. 832, 840 (Bankr. N.D. Okla. 2014) ("Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury."); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 802 (Bankr. N.D. Ohio 2001) (same). For these reasons, NDC has proven that the Debtor's acts are willful.

The Debtor's acts are malicious because she intentionally took steps to ensure that she was going to withhold the money from NDC. *White*, 519 B.R. at 839 (emphasis added) ("The term 'malicious' requires proof 'that the debtor either intend the resulting injury or **intentionally take action that is substantially certain to cause the injury**.'") (quoting *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004)).  She completely concealed all activity pertaining to the TOWR Contract and kept all of the proceeds paid by ADM for her personal use.  [Finding of Fact No. 24].  Moreover, she defied requests from Kennedy and DeGroot with respect to the ADM Contract.  [Finding of Fact No. 34].  Specifically, on July 23, 2013, DeGroot requested an invoice for the ADM Contract.  [Finding of Fact No. 33].  The Debtor did not comply with this request.  [*Id.*].  On September 9, 2013, Kennedy requested a description of the work that she had performed in addition to the total amount that she had billed to and received from ADM.  [Finding of Fact No. 35].  On that date, the Debtor informed Kennedy that she had received approximately $36,000.00 from ADM and blatantly lied that the project started on that date, when, in fact, she had already been performing services and receiving payments from ADM.  [*Id.*].  Subsequently, Kennedy reprimanded her for collecting payments and sending invoices to ADM and barred her from continuing to do so.  [Finding of Fact No. 36].  Over one month from this date—on October 17, 2013—the Debtor informed Kennedy that she sent another an invoice to ADM for $25,500— after already receiving $36,837.50—thereby disobeying his previous commands.  [Finding of Fact Nos. 37(b)–(c)].  Kennedy then instructed her to disgorge all proceeds that she had received and deposit those monies into NDC's bank account, which she, by her own testimony at trial, admitted that she did not do.  [Finding of Fact Nos. 40, 42].  In fact, she did not turn over any money to NDC, which is why NDC initiated the State Court Lawsuit.  [Finding of Fact Nos. 43–44].  Under these circumstances, NDC has proven that the Debtor's acts are malicious.  Stated differently,

NDC has proven that the Debtor's deliberately keeping all of the proceeds from the TOWR Contract and the ADM Contract instead of remitting 50% of these proceeds to NDC pursuant to the terms of the Agreement represented actions that were substantially certain to harm NDC. *See, e.g.*, *Cybuski v. Utley (In re Utley)*, No. 07-42759, 2010 WL 3342242, at *5 (Bankr. E.D. Tex. Jan. 28, 2010) (finding, when concluding that the debt was non-dischargeable under § 523(a)(6), that the Debtor "knew that selling those servers and other component parts to third parties was substantially certain to cause financial loss to On Command as well as expose its proprietary systems and technology. [The debtor] nonetheless converted On Command's property to his personal use.").

In sum, NDC has proven that the Debtor's acts were both willful and malicious under § 523(a)(6), and that because of her conduct—and knowledge—there was an objective substantial certainty that harm would befall NDC.

### 2.  Subjective Motive to Cause Harm

Alternatively, even if there was not an objective substantial certainty of harm, the Court finds that the Debtor had a subjective motive to cause harm to NDC. In analyzing the subjective motive to cause harm, the Court likens the facts in the instant case to the facts in *Texas v. Walker*, 142 F.3d 813 (5th Cir. 1998).

In *Walker*, the debtor committed conversion by improperly retaining professional fees belonging to his employer and then failing to remit these fees to his employer upon its request, which violated the written contract with his employer. 142 F.3d at 815. When the debtor's employer became aware of the debtor's noncompliance with the contract, the employer investigated the matter and made attempts to resolve the matter. *Id.* After unsuccessfully attempting to settle the contract dispute, the Debtor filed bankruptcy and was later terminated by

the employer.  *Id.*  The employer initiated the adversary proceeding, asserting that the debtor's

debt to the employer was non-dischargeable under 11 U.S.C.  523(a)(6) because it was a willful

and malicious injury.  *Id.* at 819.  The Fifth Circuit held that the issue of whether the debtor's debt

was non-dischargeable under § 523(a)(6) should be remanded and submitted to a trier of fact for

determination because the record did not support a finding of a willful and malicious injury.  *Id.*

at 824.  Indeed, the Fifth Circuit explained that the evidence supported a finding that the debtor

misunderstood his contractual obligations and his retention of the fees was "innocent and technical

rather than a willful and malicious injury."  *Id.* (internal quotations omitted).  The Fifth Circuit

further noted, in relevant part, that:

> If a factfinder were to decide that [the debtor] knew of his obligations under the . .
> . contract and its by-laws, either at the time he signed the contract . . . then it might
> also find that [the debtor] knowingly retained his professional fees in violation of
> the [contract], an act which he knew would necessarily cause the [employer's]
> injury. This, in turn, could result in a finding of "willful and malicious injury."

*Id.*

In the suit at bar, this Court must inquire into the knowledge and intent of the Debtor at the

time of the breach of the Agreement.  *See, e.g.*, *In re Williams*, 337 F.3d at 510 ("[T]he

dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and

intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or

falls within another statutory exception to discharge.").  First, at the time the Debtor and NDC

entered into the Agreement, the Debtor was knowledgeable in the diversity industry as evidenced

by her extensive education and relevant experience, [Finding of Fact Nos. 8–9]; indeed, by her

own admission, she is sophisticated in business, [Finding of Fact No. 10]; and further, she fully

understands complex contracts, as she has been for several years a college professor of business

communication, employment law, and labor law, [Finding of Fact No. 7].  Unlike the debtor in

*Walker*, the Debtor did not misunderstand her obligations under the Agreement.  [Finding of Fact No. 22].  The record shows that the Debtor—who admitted that she intentionally withheld the proceeds from the TOWR Contract and the ADM Contract, [Adv. Doc. No. 24, Aug. 7, 2018, Trial Tr. 134:22–137:2]—understood her contractual obligations and knowingly retained the proceeds from these contracts with the intent of depriving NDC of its 50% share of these funds.  [Finding of Fact No. 42].  Indeed, it is no small point that she dutifully adhered to the terms of the Agreement when she rendered consulting and training services for the Small Contract.  [Finding of Fact No. 22].  Thus, she knew that Kennedy, on behalf of NDC, was supposed to invoice and collect money from NDC's members and then process the distribution to give the Debtor her one-half share of the net profits.  [*Id.*].  Through her knowledge of her contractual obligations as well as the financial circumstances of NDC, she not only intended the act of keeping the money, but also the consequences of keeping the money from the TOWR Contract and the ADM Contract—i.e., for her to keep all of the proceeds and also for NDC to lose out on business opportunities.  *See Kawaauhau*, 523 U.S. at 58 (emphasis in original) ("Moreover, § 523(a)(6)'s formulation triggers in the lawyer's mind the category 'intentional torts,' which generally require that the actor intend the *consequences* of an act, not simply the act itself.").  While there is no dispute that the parties cross-marketed their services [Finding of Fact No. 17], NDC was acting for the benefit of both parties mutually; whereas the Debtor was acting for the sole purpose of advancing her own business goals and personal financial situation.  [*Id.*].

From these facts, the Court concludes that the Debtor acted with the subjective motive to cause harm to NDC because the scheme was carried out not only for the very purpose of absconding with the payments from the TOWR Contract and the ADM Contract, but also knowing that NDC was in a precarious financial condition and that depriving it of its 50% share of the

proceeds would further weaken NDC—an injury, it should be noted, that gave the Debtor's own personal business entities a greater competitive advantage in the diversity market place.  Under these circumstances, this Court concludes that NDC has proven that the Debtor had subjective motive to cause harm to NDC.

The Court therefore concludes that the amounts in the Judgment that are attributable to NDC's losses from the TOWR Contract and the ADM Contract are non-dischargeable.  The Court now addresses whether the attorneys' fees and pre-judgment interest incurred for the prosecution of the State Court Lawsuit—which amounts are included in the Judgment—are non-dischargeable.

## K.    The Attorneys' Fees and Interest Awarded in the Judgment are also Non-Dischargeable

The Judgment awarded $99,110.00 in attorneys' fees for the prosecution of the State Court Lawsuit.  [Finding of Fact No. 46; Pl.'s Ex. 25].  Case law has established that these attorneys' fees are also non-dischargeable.

In *Cohen v. de la Cruz*, 523 U.S. 213 (1998) the Supreme Court held that with respect to a § 523(a)(2)(A) action, when a plaintiff has successfully proven that the actual damages awarded by a state court judgment are non-dischargeable, the amount that becomes non-dischargeable encompasses both the actual damage amounts in the judgment, plus the attorney's fees awarded in the judgment.  523 U.S. at 219, 223.  In the suit at bar, this Court has held that NDC has successfully proven that a portion of the actual damages awarded in the Judgment (i.e., $80,425.00) is non-dischargeable under § 523(a)(2)(A) because NDC has shown that the Debtor obtained the net profits from the TOWR Contract and the ADM Contract through false representations, false pretenses, and actual fraud.  Thus, *Cohen* unquestionably applies.  Further, even if NDC has only proven that this portion of the Judgment is non-dischargeable under § 523(a)(6), the attorneys' fees awarded in the Judgment are still non-dischargeable.  In *Gober v. Terra + Corp. (In re Gober)*,

100 F.3d 1195 (5th Cir. 1996), the Fifth Circuit stated unequivocally that "[w]hen the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable."  100 F.3d at 1208; *see also In re Thomason*, 2018 WL 4354376, at *3; *Stokes v. Ferris (In re Stokes)*, 150 B.R. 388, 393 (W.D. Tex. 1992).

The only question is whether all of the attorneys' fees of $99,110.00 in the Judgment are non-dischargeable obligations, or, alternatively, whether only a percentage of these fees are non-dischargeable.  This Court concludes that only a percentage is non-dischargeable.  This percentage is determined by dividing the amount of damages that this Court has held to be non-dischargeable by the total amount of damages awarded in the Judgment.  Hence, the calculation is as follows: $80,425.00 ÷ $88,750.00 = 91%.  In fact, counsel for NDC is in accord with this Court's ruling pursuant to representations that he made in open court on the record.  [Tape Recording, Aug. 2, 2018, Hrg. at 10:34:35–10:35:30 A.M.; Adv. Doc. No. 25, Aug. 8, 2018, Trial Tr. 117:9-14].  Thus, this Court finds that the amount of attorneys' fees that is non-dischargeable is $90,190.10, which is calculated by multiplying the amount of attorneys' fees for trial of the State Court Lawsuit awarded in the Judgment (i.e., $99,110.00) times 91%.  Finally, this Court concludes that the interest awarded in the Judgment in the State Court Lawsuit is also non-dischargeable for the same reasons set forth in *In re Gober*, 100 F.3d at 1208.  Moreover, the same 91% calculation that is done to determine the amount of attorneys' fees that is non-dischargeable should be done for interest as well.

The Court now addresses the attorneys' fees and pre- and post-judgment interest incurred for the prosecution of this adversary proceeding.

**L.      NDC is Not Entitled to Recover the Attorneys' Fees and Costs that it has Incurred for the Prosecution of this Adversary Proceeding**

"It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996) (citing *Branch-Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir. 1991)).  Here, not only did NDC fail to request an award of its attorneys' fees in the Complaint for the prosecution of this adversary proceeding, [Finding of Fact No. 49], the joint pretrial statement also contains no request for attorneys' fees, [Finding of Fact No. 52].  Under these circumstances, the Court finds that NDC has waived any right it may have had to the attorneys' fees that it has incurred for the prosecution of this adversary proceeding.

Fifth Circuit case law supports this ruling.  In *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998), the plaintiff appealed the district court's denial of its attorney's fees. The Fifth Circuit affirmed this ruling by stating that the plaintiff had waived its claim for such fees because the joint pretrial statement never requested the fees under the applicable statute.  *Id.* at 206.  The facts at bar are very similar to those in *Capece*, and, accordingly, NDC is not entitled to recover its attorneys' fees for prosecuting this adversary proceeding.

Alternatively, even if NDC had requested its attorneys' fees in the joint pretrial statement, under the "American Rule," each party pays his/her own attorneys' fees unless a statute or contract—a so-called "fee shifting" provision—sets forth otherwise.  *Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015); *Fort Apache Energy, Inc. v. Huddleston (In re Huddleston)*, No. 16-31488-SGJ-7, 2017 WL 1207522, at *15 (Bankr. N.D. Tex. Mar. 31, 2017).  Here, there is no statute that allows NDC to recover its attorneys' fees; indeed, the Code does not provide for such relief.  Stated differently, 11 U.S.C. § 523 does not provide attorney's fees as relief to the prevailing party.

In its post-trial brief, NDC relies on the section 38.001(8) of the Texas Civil Practice and Remedies Code to recover attorneys' fees. [Adv. Doc. No. 29]; Tex. Civ. Prac. & Rem. Code § 38.001(8) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."). However, NDC's reliance on this statute in this adversary proceeding is misplaced. The State Court has already awarded attorneys' fees to NDC pursuant to this statute, which this Court has already determined is a portion of the entire non-dischargeable debt as set forth herein. Furthermore, section 38.001(8) of the Texas Civil Practice and Remedies Code does not extend to this adversary proceeding because NDC is suing the Debtor under §§ 523(a)(2)(A) and (a)(6), and these statutes do not provide such relief.

Even assuming that section 38.001(8) of the Texas Civil Practice and Remedies Code applies to this adversary proceeding, NDC's argument still fails. NDC incorrectly cites to *Cohen v. de la Cruz*, 523 U.S. 213 (1998) and *Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598 (Bankr. S.D. Tex. 2018) in support of an award of attorneys' fees incurred for the prosecution of this adversary proceeding. In *Cohen*, the tenants initiated the adversary proceeding, asserting that the debt owed to them was non-dischargeable under § 523(a)(2)(A). 523 U.S. at 215. In their complaint filed in the bankruptcy court, the tenants also expressly sought treble damages, attorney's fees, and costs under the New Jersey Consumer Fraud Act. *Id.* The Supreme Court explained that "[u]nder New Jersey law, the debt for fraudulently obtaining . . . rent payments includes treble damages and attorney's fees and costs, and consequently, petitioner's entire debt . . . is nondischargeable in bankruptcy." *Id.* at 223. The facts in *Cohen* are distinguishable from the facts in the suit at bar. Unlike the tenants in *Cohen*, NDC did not expressly request its attorneys' fees in the Complaint or the joint pretrial statement or, for that matter, cite to any Texas statute

92

providing for an award of fees.  Therefore, NDC has waived this claim and is not entitled to attorneys' fees for the prosecution of this adversary proceeding.

In *In re Tegeler*, this Court awarded attorneys' fees incurred by the plaintiff for the prosecution of the adversary proceeding based upon the Plaintiff's request for such fees in its complaint and pre-trial order and, importantly, based upon the provisions of an express provisions in a written contract allowing recovery of attorney's fees.  586 B.R. at 705.  This Court explained as follows:

> First, the Guaranties that each of the Debtors signed promise to pay [the plaintiff]  "all legal expenses related thereto permitted by law, [the plaintiff's] reasonable attorneys' fees, arising from any and all debts, liabilities, and obligations of every nature or form, now existing or hereafter arising or acquired, that [the Debtors' company] individually or collectively or interchangeably with others, owes or will owe [the plaintiff]."

*Id.*  Here, the only contract involved in this suit is an oral contract (i.e., the Agreement), [Finding of Fact No. 12], and the record is devoid of any evidence that one of the terms of the Agreement is that NDC could recover its attorneys' fees.  Stated differently, the Agreement contains no term awarding attorneys' fees to any party who has prevailed in a lawsuit.  Accordingly, NDC cannot recover the attorneys' fees that it has incurred for the successful prosecution of this adversary proceeding.

## M.   NDC is Entitled to Pre- and Post-Judgment Interest, and this Interest is Non-Dischargeable

Similar to NDC's failure to request its attorneys' fees for prosecuting this adversary proceeding, NDC did not request either pre- or post-judgment interest in the Complaint or in the joint pretrial statement.[33]  [Finding of Fact Nos. 49, 52].  Under these circumstances, one would

---

[33] For purposes of clarity, the phrase "post-judgment interest" does ***not*** refer to the interest that has been accruing on the Judgment at the rate of 5.0% per annum, which was the rate that the State Court determined when it entered the Judgment on February 3, 2017 in the State Court Lawsuit.  Rather, this phrase refers solely to the interest that will accrue at the federal judgment interest rate beginning on the date of the entry of this Court's order declaring a portion

think that NDC is not entitled to any interest based upon the rule articulated by the Fifth Circuit in *Capece* that a joint pretrial order supersedes all pleadings, and that failure to assert a claim in the joint pretrial statement waives that particular claim. However, there is an exception to this rule with respect to pre-judgment and post-judgment interest.

In *Meaux Surface Protection, Inc. v. Fogleman*, the plaintiff requested pre- and post-judgment interest in its original complaint but did not reassert these requests in the pretrial order. 607 F.3d 161, 172 (5th Cir. 2010). The district court denied the request for such interest. *Id.* On appeal, the defendants argued that the ruling was correct on the grounds that the plaintiff had waived any rights to interest due to its failure to request such relief in the pretrial order. *Id.* And, in fact, in issuing its opinion in *Meaux Surface Protection, Inc.*, the Fifth Circuit conceded that the "Defendants' waiver argument is not entirely without support." *Id.* Nevertheless, the Fifth Circuit rejected this waiver argument.

It did so in two respects. First, with respect to post-judgment interest, the Fifth Circuit, citing 28 U.S.C. § 1961(a), articulated an ironclad rule that "[p]ost-judgment interest is awarded as a matter of course." *Id.* at 173. Indeed, the Fifth Circuit held that "[t]he matter is not discretionary . . . . Moreover, failure to brief the matter is treated as oversight, not waiver." *Id.* (internal quotation marks and citation omitted). Stated differently, the Fifth Circuit held that even though the plaintiff failed to request post-judgment interest in the pretrial statement, it did not waive the right to such interest and, in fact, was entitled to this interest pursuant to the statute.

---

of the Judgment to be non-dischargeable. Thus, the interest rate of 5.0% per annum will be replaced by the federal judgment interest rate. *Vargas v. Guinn (In re Guinn)*, No. 13-07239-CL7, 2014 WL 4426125, at *8 (Bankr. S.D. Ca. Aug. 21, 2014) (holding that the interest rate set forth in the state court judgment is only effective up to the date of the bankruptcy court's entry of its judgment of non-dischargeability, and that thereafter the rate will be the federal post-judgment interest rate pursuant to 28 U.S.C. § 1961); *Cottle v. Ariz. Corp. Com. (In re Cottle)*, No. AZ-16-1078-JuFL, 2016 Bankr. LEXIS 3751, at *14–15 (B.A.P. 9th Cir. Sept. 23, 2016) (same). Further, for purposes of clarity, the phrase "pre-judgment interest" refers to all of the interest that has been accruing at 5.0% per annum under the Judgment up to the date of the entry of this Court's order declaring a portion of the Judgment to be non-dischargeable.

Application of this rule in this adversary proceeding at bar leads this Court to conclude that even though NDC did not plead for post-judgment interest in the joint pretrial statement, it is nevertheless entitled to such interest, which will begin to accrue at the federal judgment interest rate on the date of the entry of this Court's order declaring portions of the Judgment to be non-dischargeable.

With respect to pre-judgment interest, the Fifth Circuit's decision in *Fogleman* also provides an exception to the general rule that a claim is waived if not requested in the joint pretrial statement. Specifically, the Fifth Circuit stated that:

> "State law governs the award of prejudgment interest in diversity cases." *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (citations omitted). "In the absence of a statutory right to prejudgment interest, Texas law allows for an award of equitable prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex. 1985)." *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996). Under this standard, "an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances." *Id.* (citation omitted).

*Id.* at 172. Thus, with respect to diversity cases, the Fifth Circuit set forth that pre-judgment interest should be granted in all but exceptional circumstances. Admittedly, the adversary proceeding at bar is not a diversity suit; nevertheless, other Fifth Circuit cases support a conclusion that NDC is entitled to pre-judgment interest despite its failure to include such a request in the joint pretrial statement. In *Consolidated Cigar Co. v. Texas Commerce Bank*, the Fifth Circuit stated that "[f]ederal courts have recognized that while the substantive questions of entitlement to interest and the rates of interest are to be resolved by the applicable state law, the adequacy of a plaintiff's pleadings must be resolved by reference to Fed. R. Civ. P. 54(c) and cases construing it." 749 F.2d 1169, 1174 (5th Cir. 1985) (citations omitted). The Fifth Circuit then noted that "under the Federal Rules . . . there is no requirement for a specific pleading for prejudgment

interest." *Id.* at 1175.  Indeed, according to the Fifth Circuit:  "Under Texas law, prevailing parties receive prejudgment interest as a matter of course . . . . The award of prejudgment interest is 'based on the equitable grounds that an injured party should be made whole.'" *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329–30 (5th Cir. 1994) (quoting *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)).  This is so even if the party who is receiving such interest has been accorded only a part of the relief that it has requested.  *Id.* at 1329.

Here, the State Court awarded interest to NDC in the Judgment at 5.0% per annum. [Finding of Fact No. 47].  Under these circumstances, this Court does not discern any "exceptional circumstances" under the *Fogleman* holding to deny pre-judgment interest (accruing at 5.0% per annum during the pendency of this adversary proceeding) even though NDC failed to expressly request such relief in its pretrial statement.  The Court also notes that the Fifth Circuit has expressly stated that "[t]he Texas Supreme Court has made clear that the award of prejudgment interest, although equitable in nature, is not generally a matter for the trial court's discretion."  *Executone Info. Sys., Inc.*, 26 F.3d at 1330 (citing *Matthews*, 721 S.W.2d at 287).  These comments, plus holdings from Texas courts awarding pre-judgment interest for successful prosecution of fraud claims[34]—i.e., tortious claims that are similar to the tortious claims by NDC in the suit at bar[35]— convince this Court that it must award pre-judgment interest to NDC.  Here, the pre-judgment interest, which has been accruing at 5.0% per annum as set forth in the Judgment, will run from the date that NDC initiated the pending adversary proceeding—i.e., November 17, 2017—up to

---

[34] *See, e.g.*, *Voskamp v. Arnoldy*, 749 S.W.2d 113, 124 (Tex. App.—Houston [1st Dist.] 1987, writ den'd).

[35] Claims brought under §§ 523(a)(2) and (a)(6) are tort claims.  *See, e.g.*, *In re Mendiola*, 99 B.R. 864, 866 (Bankr. N.D. Ill. 1989) ("There are three other general categories of debt that are not discharged according to Section 523(a), which require some special attention. These are a variety of intentional tort claims, described in subsections (2), (4) and (6) of Section 523(a).").

the date of the entry of this Court's order declaring that portions of the Judgment are non-dischargeable.[36]  *See Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 739 F. Supp. 338, 341 (S.D. Tex. 1990) (awarding prejudgment interest from the date of the filing of the original complaint to the date of judgment).

Any interest that accrues—both prior to, and after, the entry of this Court's order declaring portions of the Judgment to be non-dischargeable—is also non-dischargeable pursuant to the Supreme Court's language in *Cohen* that the non-dischargeable debt includes "other relief" that is awarded.  *Cohen*, 523 U.S. at 223; *In re Gober*, 100 F.3d at 1208; *Fire Safe Prot. Servs., LP v. Ayesh (In re Ayesh)*, 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011) (applying *Cohen* to find legal fees, interest, and other costs from the breach of contract to be non-dischargeable); *Miller v. Lewis*, 391 B.R. 380, 385 (E.D. Tex. 2008) (applying *Cohen* and finding that the entirety of a judgment was an "obvious outgrowth" of the "fraudulent scheme").

The amount of interest that is non-dischargeable as of the date of this Court's order declaring  portions of the Judgment to be non-dischargeable can be calculated as follows.  First, the portion of the amount of liability  under the Judgment that is non-dischargeable—and upon which pre-judgment interest of 5% per annum is calculated—must first be determined.  This amount is calculated by adding the following numbers:

> (1) $80,425.00 (i.e., the 50% amount of proceeds from the TOWR Contract and the ADM Contract that the Debtor should have, but did not, give to NDC); plus
>
> (2) $15,924.15 (i.e., interest of 6% on $80,425.00 from October 17, 2013 to February 3, 2017);[37] plus

---

[36] Of course, NDC is also entitled to the interest on the Judgment that was accruing at 5.0% per annum even before NDC initiated the instant adversary proceeding.

[37] The Judgment awards pre-judgment interest (i.e., interest accruing prior to the entry of the Judgment in the State Court Lawsuit) of 6% per annum from October 17, 2013 (which was the date NDC made demand upon the Debtor to pay the amounts owed to it under the Agreement) to February 3, 2017 (i.e., the date the Judgment was signed by the State Court).  [Finding of Fact No. 47].  This specific amount of interest set forth in the Judgment is $17,421.47.  [*Id.*].  Under the Judgment, this 6% accrued on $88,370.00, which is the amount the jury awarded NDC due to its finding

(3)  $90,190.10 (i.e., the attorneys' fees).

The sum of these three numbers is $186,539.25.

Second, having determined this figure, it is now necessary, using the interest rate of 5% set forth in the Judgment, to calculate the interest from February 3, 2017, to the date that this Court enters its order declaring a portion of the Judgment to be non-dischargeable.  This amount of interest is calculated as follows:  $186,539.25  x  5%  x  (655 days  ÷  365 days) = $16,695.26.  Thus, the amount of pre-judgment interest that is non-dischargeable is $16,695.26.

Additionally, court costs of $2,402.66 are also a non-dischargeable debt, as the Judgment expressly set forth that NDC shall recover its court costs from the Debtor.  The figure of $2,405.66 is set forth in the proof of claim that NDC filed in the Debtor's main Chapter 7 case.  The Debtor has never objected to this proof of claim and therefore this figure is deemed valid.  *In re Gilbreath*, 395 B.R. 356, 361 (Bankr. S.D. Tex. 2008) (citing 11 U.S.C. § 502(a) and Fed. R. Bankr. P. 3001(f)).

In sum, the aggregate amount that will bear interest at the federal judgment interest rate (once this Court enters its order of non-dischargeability on the docket) is $205,640.17, which represents the sum of the following figures:

(1)  $80,425.00 (i.e., the 50% amount of proceeds from the TOWR Contract and the ADM Contract that the Debtor should have, but did not, give to NDC); plus

(2)  $15,924.15 (i.e., interest of 6% on $80,425.00 from October 17, 2013 [date of termination of the Agreement by NDC] to February 3, 2017 [date of Judgment]); plus

---

that the Debtor should have paid NDC 50% of the proceeds that she received from the TOWR Contract, the ADM Contract, and the Recruiting Services Contract.  However, because this Court has found that the proceeds relating to the Recruiting Services Contract that the Debtor owes to NDC is a dischargeable debt, this Court must determine the amount of non-dischargeable interest by multiplying 6% against the amount of the non-dischargeable debt associated with the TOWR Contract and the ADM Contract (i.e., $80,425.00).  This amount is $15,924.15.  Thus, of the $17,421.47 awarded in the Judgment, $15,924.15 is non-dischargeable and $1,497.32 is dischargeable.

(3)  $90,190.10 (i.e., the attorneys' fees); plus

(4)  $16,695.26 (i.e., the pre-judgment interest from the date of Judgment to the date of this Court's order of non-dischargeability); plus

(5)  $2,405.66 (i.e., the court costs from the State Court Lawsuit).

## V.  CONCLUSION

Sir Walter Scott's maxim applies to the Debtor: "O, what a tangled web we weave when first we practise to deceive!"[38]  Here, the Debtor deceived NDC by failing to make key disclosures relating to the TOWR Contract.  Furthermore, the Debtor deceived NDC by making numerous misrepresentations with respect to the ADM Contract.  Her conduct in directing ADM to send payments to her own company rather than to NDC helped her achieve her ultimate objective of collecting and retaining all of the payments from ADM and depriving NDC of its 50% share of these proceeds—which acts clearly were in violation of the Agreement.  After NDC actually became aware of her objective and unsuccessfully attempted to amicably resolve the contract dispute, it resulted in not only a jury verdict against her in the State Court, but also her own Chapter 7 filing on August 23, 2017.  Having voluntarily chosen to file Chapter 7, the Debtor must now suffer the consequences of having defrauded NDC.  NDC has successfully proven the necessary elements of each of its three § 523(a)(2)(A) claims against the Debtor, and accordingly, the Court finds that except for the sum of $7,945.00, all of the Judgment is a non-dischargeable debt.

Additionally, NDC has successfully proven the necessary elements of its § 523(a)(6) claim against the Debtor, and accordingly the Court once again finds that except for the sum of $7,495.00, all of the Judgment is a non-dischargeable debt.

---

[38] Sir Walter Scott, *Marmion, Canto vi. Stanza 17*.  The Court notes that the word "practise" is not misspelled in this quotation.

In sum, this Court concludes that the amount of the Judgment that is non-dischargeable is $205,640.17, which represents the sum of the following figures:

(1) $80,425.00 (i.e., the 50% amount of proceeds from the TOWR Contract and the ADM Contract that the Debtor should have, but did not, give to NDC); plus

(2) $15,924.15 (i.e., interest of 6% on $80,425.00 from October 17, 2013 [date of termination of the Agreement by NDC] to February 3, 2017 [date of Judgment]); plus

(3) $90,190.10 (i.e., the attorneys' fees); plus

(4) $16,695.26 (i.e., the pre-judgment interest from the date of Judgment to the date of this Court's order of non-dischargeability); plus

(5) $2,405.66 (i.e., the court costs from the State Court Lawsuit).

The amount of $205,640.17 will bear interest at the federal judgment interest rate as soon as this Court enters its order of non-dischargeability on the docket.

An order consistent with these Findings of Fact and Conclusions of Law will be entered on the docket simultaneously herewith.

Signed on this 19th day of November, 2018.

_____
Jeff Bohm
United States Bankruptcy Judge